**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Yu Shi
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com
         yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK MACHNIEWICZ, Individually and on behalf of all others similarly situated, | Case No: 1:19-cv-0822-MKB-VMS |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| UXIN LIMITED, KUN DAI, ZHEN ZENG, RONG LU, JULIAN CHENG, DOU SHEN, HAINAN TAN, MORGAN STANLEY & CO. INTERNATIONAL PLC, GOLDMAN SACHS (ASIA) L.L.C., J.P. MORGAN SECURITIES LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, and CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, | <u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |
| Defendants. | |

Lead Plaintiff Saleh Doron Gahtan and named plaintiff Daniel Chiu ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Uxin Limited ("Uxin" or the "Company"), interviews with former employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Uxin American Depositary Shares ("ADSs") from June 27, 2018 through April 15, 2019, inclusive (the "Class," and the period from June 27, 2018 to April 15, 2019 is the "Class Period").[1]  Plaintiffs bring the following claims on behalf of the Class: (1) Sections 11, 12(a)(2), and 15 under the Securities Act for all purchasers of Uxin ADSs pursuant and/or traceable to the Registration Statement and Prospectus (collectively, the "Registration Statement") in connection with Uxin's June 27, 2018 initial public offering ("IPO"); and (2) Section 10(b) and 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of Uxin ADSs during the Class Period, except persons who purchased directly from the Underwriters (defined below) at the offering price in the IPO.

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Uxin at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

2.      Uxin is a China-based company incorporated under the laws of the Cayman Islands.  It is headquartered in Beijing, China.  Uxin operates a used car e-commerce platform in China, facilitating the purchases and sales of used cars.

3.      Uxin describes itself as the largest used car e-commerce platform in China in terms of both the number of transactions facilitated (*i.e.* transaction volume) and total gross merchandise value (GMV) of used cars sold.

4.      Uxin's operates in two main segments: Uxin Used Car (known as "2C"), which sells to consumers, and Uxin Auction (known as "2B"), which sells to businesses.  Uxin makes money from the fees it charges for transaction facilitation and auto loan facilitation.

5.      Uxin's 2B business, which accounted for 27% of Uxin's total revenue in 2017, is compromised of two components: C2B (consumers selling used cars to dealers), and B2B (dealers selling used cars to other dealers).

6.      On June 27, 2018, Uxin went public in the United States via an initial public offering (the "IPO").  In the IPO, Uxin sold 25,000,000 ADSs at a price of $9.00 per ADS, receiving total proceeds of $209.25 million after underwriting commissions.  In connection with the IPO, Uxin filed a registration statement and prospectus (together, the "Registration Statement") with the SEC.

7.      In the Registration Statement, Uxin touted its proprietary "300 check point" inspection service, known as Check Auto, calling it a "key feature" and "critical foundation" of Uxin's business.

8.      Unbeknownst to investors, Uxin was embarking on a plan to drastically curtail its 2B business and stop providing Check Auto services to consumers who utilize Uxin's platform to sell their used cars to dealers.

9. Less than two months after the IPO, on August 22, 2018 Uxin announced that it was changing its business model. Specifically, Uxin would drastically reduce the scope of its 2B business and cease providing inspections and ancillary services – a competitive advantage differentiating Uxin from its competitors – to consumers who sell their cars on Uxin's 2B platform (*i.e.* C2B transactions).

10. The significance of this shift in business strategy became apparent when, on November 19, 2018, Uxin disclosed that in the third quarter of 2018, its 2B business transaction volume had decreased by 8.5% year-over-year. Additionally, GMV for Uxin's 2B business had declined by over RMB 700 million compared to the same period the year before. Uxin attributed these declines to its "recent change of approach in serving customers with car-selling needs as disclosed in the prior quarter." Uxin noted that if it excluded the impact from the shift in business strategy, the 2B business actually experienced considerable growth year-over-year instead of the decline that occurred.

11. Following this news, Uxin ADS price fell by $0.60 per share, or more than 11%, to close at $4.50 per ADS on November 20, 2018, approximately 50% below the $9.00 IPO price.

12. The full extent of Uxin's decision to change its 2B service and eliminate Check Auto for C2B transactions became clear on March 14, 2019, when Uxin announced its fourth quarter and full year 2018 financial results. Uxin disclosed that transaction volume for its 2B business declined to 72,081 in the fourth quarter, representing a year-on-year decline of 37.1%. Additionally, GMV for the 2B business declined by 8.8% for the quarter and 12.2% for the full year.

13.     In its 2018 annual report, Uxin finally admitted that its decision to curtail the 2B business was material, stating: "Such adjustment may not achieve expected results and may have a material and adverse impact on our financial condition and results of operation."

14.     Furthermore, on April 16, 2019, the analyst firm J Capital Research USA LLC issued a report revealing that Uxin made additional misleading statements in the Registration Statement.

15.     J Capital found that Uxin had grossly inflated its transaction volume and GMV in the Registration Statement, casting grave doubt on Uxin's claim that it's the "largest used car e-commerce platform in China."

16.     Specifically, J Capital found that Uxin provides POS software (*i.e.* software for processing payments) to car dealers, and Uxin counts every transaction processed using Uxin's POS as Uxin transactions, regardless of whether they were actually facilitated by Uxin.  In other words, third-party transactions that had nothing to do with Uxin were counted as Uxin transactions.

17.     J Capital's findings were confirmed by Uxin's later admissions.  Uxin's 2018 20-F, filed with the SEC on April 29, 2019, disclosed for the first time that Uxin's reported GMV included "certain free-of-charge intraregional transactions we facilitate…".  Then, on June 10, 2019, Uxin disclosed that, beginning the first quarter ended March 31, 2019, "Uxin will only disclose the transaction volume and the corresponding GMV for the transactions which generate revenues."

18.     As a result, Uxin's transaction volume and GMV dropped precipitously.  Using the revised measure, Uxin's first quarter 2019 2C transaction volume "increased to 78,227 units representing year-over-year growth of 39.6%."  This means that Uxin's actual 2C transaction

volume was only 56,035 units for the first quarter of 2018 – a far cry from the 101,425 units that Uxin claimed in the Registration Statement.

19.     A similar shrinkage occurred in reported GMV, as Uxin disclosed that: "GMV for the 2C business increased to RMB8,892 million in the first quarter of 2019, representing year-over-year growth of 61.5%." This means that the actual GMV for the first quarter of 2018 was RMB5,505 million – compared to RMB8,565 million as claimed in the Registration Statement.

20.     Indeed, nowhere in the Registration Statement did Uxin disclose that almost half of its supposed "transaction volume", and one-third of its GMV, produced zero revenue. This renders meaningless Uxin's boasts in the Registration Statement about its industry-leading transaction volume and GMV. Transaction volume and GMV mean nothing to investors if Uxin is receiving no revenue from a substantial portion of those transactions. This is material information that any reasonable investor would want to know.

21.     Accurate transaction volume and GMV figures are also important to investors because Uxin stated in the Registration Statement that one of the "special factors" affecting its business is the "ability to increase our transaction volume and GMV" and that the Company's revenue growth will "depend largely on the increase of transaction volume on our platform."

22.     J Capital also found that Uxin was itself buying used cars to list and sell on its platform. This is confirmed by the Chinese media, which reported that in 2016 Uxin purchased 150,000 used cars to sell on its platform, and that in 2017 Uxin aimed to purchase 200,000 used cars to list and sell on its platform. Plaintiffs' investigator also corroborated this fact through interviews with a former Uxin employee.

23.     Given that Uxin's Registration Statement claimed a total transaction volume of 377,777 cars in 2016, the 150,000 used cars that Uxin itself purchased in 2016 to sell on its

platform accounted for 39% of Uxin's total 2016 transaction volume.  And if Uxin purchased 200,000 used cars to list and sell on its platform in 2017, that would account for 31% of Uxin's claimed total transaction volume of 634,317 cars.  The actual proportion is even higher because Uxin's 2016 and 2017 transactional volume included those from which Uxin generated no revenue.

24.     That Uxin was itself buying used cars to sell conflicts with the business model of Uxin as presented in the Registration Statement.  According to the Registration Statement, Uxin operates a *platform*, and consumers and dealers transact on Uxin's platform because of its unique features such as Check Auto.  Nowhere in the Registration Statement did it say that Uxin itself is a used car dealer.  Indeed, this would change Uxin's business model from being an e-commerce platform, similar to an eBay, to being a dealer – a fundamentally different business a much lower price to earnings or revenue multiple.

25.     Following the publication of the J Capital Report, Uxin ADSs closed at $1.95 per ADS, representing a 78% decline from the price at which Uxin ADSs had been sold to the investing public less than ten months earlier in the IPO.

## JURISDICTION AND VENUE

26.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because certain of the acts and conduct complained of herein, such as the trading of Uxin ADSs on NASDAQ, occurred in this District.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## PARTIES

30.     Lead Plaintiff Saleh Doron Gahtan ("Gahtan") purchased Uxin ADSs pursuant and traceable to the Registration Statement during the Class Period, and was damaged thereby. Gahtan's PSLRA certification was previously filed with the Court and is incorporated by reference herein.  *See* Dkt. No. 7-2.

31.     Named plaintiff Daniel Chiu ("Chiu") purchased Uxin ADSs pursuant and traceable to the Registration Statement during the Class Period, and was damaged thereby.  Chiu's PSLRA certification is attached as Exhibit 1.

32.     Defendant Uxin purports to be the largest used car e-commerce platform in China. Uxin is incorporated under the laws of the Cayman Islands and its principal executive offices are located in Beijing, China. Uxin's ADSs trade on the NASDAQ under the ticker symbol, "UXIN."

33.     Defendant Kun Dai ("Dai") was, at all relevant times, the Chief Executive Officer ("CEO") and Chairman of the Board of Directors.  Prior to the IPO, Dai held 24.9% of Uxin's stock.  Immediately after the IPO, Dai held 44.9% of Uxin's aggregate voting power, including through his beneficial ownership of all of Uxin's Class B shares, each of which had ten votes per

share.  According to the Registration Statement, "holders of Class B ordinary shares" such as Dai "will have considerable influence over matters such as decisions regarding mergers and acquisitions, election of directors and other significant corporate actions."  On June 27, 2018, Dai appeared on CNBC in its New York City studios to promote Uxin's IPO, and revealed that he had gone on a "road show" in the United States in connection with the IPO.

34.    Defendant Zhen Zeng ("Zeng") was, at all relevant times, the Chief Financial Officer ("CFO") and a Director of the Company.

35.    Defendant Rong Lu ("Lu") was, at all relevant times, a Director of the Company.

36.    Defendant Julian Cheng ("Cheng") was, at all relevant times, a Director of the Company.

37.    Defendant Dou Shen ("Shen") was, at all relevant times, a Director of the Company.

38.    Defendant Hainan Tan ("Tan") was a Director of the Company until his resignation on December 21, 2018.

39.    Defendants Dai, Zeng, Lu, Cheng, Shen, and Tan are collectively referred to hereinafter as the "Individual Defendants."

40.    The Individual Defendants each reviewed and signed the Registration Statement.

41.    Defendant Morgan Stanley & Co. International plc ("Morgan Stanley") served as an underwriter for the IPO. In the IPO, Morgan Stanley agreed to purchase 8,125,000 of the Company's ADSs.

42.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the IPO. In the IPO, Goldman Sachs agreed to purchase 8,125,000 of the Company's ADSs.

43.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO. In the IPO, J.P. Morgan agreed to purchase 5,000,000 of the Company's ADSs.

44.     Defendant China International Capital Corporation Hong Kong Securities Limited ("China International") served as an underwriter for the IPO. In the Offering, China International agreed to purchase 1,875,000 of the Company's ADSs.

45.     Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") served as an underwriter for the IPO. In the Offering, China Renaissance agreed to purchase 1,875,000 shares of the Company's ADSs.

46.     Defendants Morgan Stanley, Goldman Sachs, J.P. Morgan, China International, and China Renaissance are collectively referred to hereinafter as the "Underwriters."

47.     Pursuant to the Securities Act, the Underwriters are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriters are investment banking firms that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared $15.7 million in fees collectively. The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in the dissemination of the Registration Statement.  However, the Underwriters failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misstatements or omissions.

10

(b)     In addition, the Underwriters met with potential investors and presented highly favorable but incorrect and/or misleading information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

(c)     Representatives of the Underwriters also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriters had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

(d)     In addition to having access to internal corporate documents, the Underwriters and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriters' representatives and the Company's management and top executives, the Underwriters were, at a minimum, negligent in allowing dissemination of the material misstatements and omissions contained in the Registration Statement as detailed herein.

(e)     The Underwriters caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other members of the Class.

48.     The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

49.     Defendants Uxin, the Individual Defendants, and the Underwriters are collectively referred to herein as "Defendants."

## MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT

### Uxin's Business

50.     Uxin was founded in 2011 and is headquartered in Beijing, China.  Uxin purports to be China's largest used car e-commerce platform by number of transactions (*i.e.* "transaction volume") and gross merchandise value ("GMV").[2]  Uxin calls itself "the destination for online used car transactions in China", enabling "consumers to buy cars from dealers" and "dealers to buy cars from other dealers and consumers."

51.     Uxin's platform consists of two lines of business: Uxin Used Car (also referred to as "2C"), which caters to consumer buyers, and Uxin Auction (also referred to as "2B"), which caters to business buyers.  Uxin also provides financing services to buyers for their used car purchases.

---

[2] GMV refers to the gross merchandise value of used cars transacted on Uxin's platform, as measured by the gross selling price of used cars.

52.     The 2B business includes two types of transactions: consumers selling used cars to dealers ("C2B") and dealers selling used cars to other dealers ("B2B").   In 2017, Uxin's 2B business accounted for 27% of its total revenue.

53.     Because of China's rapidly expanding middle class, the auto market in China is surging.   China is currently the second largest car market in the world, behind only the U.S. Moreover, the demand for used cars in China is also great.   In 2017, there was one used car sold in China for every two new cars sold.   In total 12.4 million used cars were sold in China in 2017.

54.     Chinese consumers and dealers, however, face a number of challenges.   Foremost is the uneven distribution of car dealerships and limited local car selection.   For example, A large city like Beijing might have 15,000 used cars available for purchase at any given time, while a smaller city might only have 50 used cars available for sale.

55.     Uxin tries to mitigate this imbalance with its online platform that aims to connect buyers with used cars for sale all over China.   In other words, Uxin wants to turn China's used car market from a "local market" to a "national market."

56.     One of Uxin's touted features is its Check Auto inspection service.   Uxin's Check Auto inspections are pursuant to a proprietary process that allows for standardized evaluations across the platform, which is particularly important for repeat customers such as the dealers served in Uxin's 2B business segment.

***Uxin's Registration Statement and IPO***

57.     On June 22, 2018, after a series of amendments, Uxin filed its final registration statement with the SEC on Form F-1/A.   The registration statement was declared effective on June 26, 2018.   Subsequently, on June 28, 2018, Uxin filed the final prospectus ("Prospectus") for the IPO, which forms part of the registration statement (the registration statement and Prospectus are

collectively referred to herein as the "Registration Statement").

58.     In the IPO, Uxin sold 25,000,000 ADSs at a price of $9.00 per share. Each ADS represents three shares of Class A common stock. Uxin raked in proceeds of approximately $209.25 million from the IPO, net of underwriting discounts and commission.

59.     The Registration Statement contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

Registration Statement Failed to Disclose Uxin's Imminent Shift in Business Strategy

60.     In the Registration Statement, Uxin repeatedly touted its proprietary Check Auto inspection service.  The Registration Statement described Check Auto as a "key feature" and a "critical foundation" of Uxin's business, and that it is "central to [Uxin's] platform."

61.     Emphasizing the importance of Check Auto, the Registration Statement touts as one of Uxin's strength that it is "committed to providing comprehensive and accurate descriptions of vehicles on our platform.  To accomplish this, we use our standardized and patented *Check Auto* system which is a standardized inspection process involve [sic] more than 300 check points. The inspection produces detailed reports including a comprehensive set of photos and videos of the cars which we make available to users."

62.     The Registration Statement also described the 2B user's "buying journey," which included as one of the five keys stages: "*Evaluation*: All car listings on Uxin Auction include a comprehensive car condition report generated by our Check Auto system."

63.     The Registration Statement, however, omits to disclose that Uxin would imminently and drastically curtail the scope of its 2B business, and cease providing its patented

Check Auto inspection services to consumers seeking to sell used cars to dealers ("C2B" transactions).

64.     On August 22, 2018, less than two months after the IPO, Defendant Dai announced that Uxin would drastically shrink its 2B business and cease providing Check Auto inspections for C2B transactions:

> [W]e historically provided inspection and other complementary services that enabled consumers to sell used cars through our 2B business. Starting in the second half of 2018, we will take an alternative approach that connects these consumers with quality dealers on our platform without us providing inspection and other services directly. Due to this change to our service approach, we will no longer record the corresponding GMV, which has historically made an immaterial contribution to our overall business. Our B2B auction business remains unchanged.

65.     Uxin attempted to downplay the shift in business strategy.  Dai stated in the same release that "[d]ue to this change to our service approach, we will no longer record the corresponding GMV, *which has historically made an immaterial contribution to our overall business*."  (emphasis added).

66.     But the impact on Uxin's business was significant.  On November 19, 2018 after market close, in a press release announcing its third quarter 2018 financial results, Uxin reported that the transaction volume for its 2B business had decreased to 91,844 units, representing a year-over-year decline of 8.5%, and the GMV had decreased to RMB 4.279 million, representing a year-over-year decline of 14.8%.  In the earnings release, Uxin attributed these results to its "recent change of approach in serving customers with car-selling needs as disclosed in the prior quarter." Excluding the impact of this change, however, "the B2B business experienced 13.3.% year-on-year growth in terms of GMV."

67.     Indeed, this undisclosed shift in Uxin's business strategy reduced the GMV of the used cars sold in the 2B segment during the third quarter of 2018 by over RMB 700 million, as

compared to the prior year.  As Uxin noted, if it excluded the adverse effects of the change in business, the 2B business experienced substantial growth rather than decline.

68.     Following this news, Uxin's ADS price fell $0.60 per share, or approximately 11.7%, to close at $4.50 on November 20, 2018. This constituted a decline of 50% from the $9 IPO price.

69.     The impact was even more drastic in the fourth quarter of 2018, the first full quarter following Uxin's purportedly immaterial change to its business strategy.  On March 14, 2019, Uxin reported fourth quarter 2018 and full year 2018 financial results, and Uxin's transaction volume in the 2B business suffered heavily because of Uxin's decision to curtail its 2B business, including the decision to cease providing Check Auto services for C2B transactions, a feature that distinguished Uxin from its numerous competitors:

> Transaction volume for the 2B business decreased to 72,081 units in the fourth quarter of 2018, representing year-on-year decline of 37.1%, due to the Company's change of approach in serving consumers with car-selling needs as well as dealers' growing appetite for retail transaction through Uxin's 2C platform.
> ***
> GMV for the 2B business decreased to RMB3,349 million in the fourth quarter of 2018, representing year-on-year decline of 40.2%.

70.     The material adverse impact of Uxin's shift in business strategy was also evident in the full year 2018 transaction volume and GMV figures for the 2B business:

> Transaction volume for the 2B business decreased to 319,672 units in the full year 2018, representing year-on-year decline of 8.8%, due to the Company's change of approach in serving consumers with car-selling needs as well as dealers' growing appetite for retail transaction through Uxin's 2C platform.
> ***
> GMV for the 2B business decreased to RMB15,253 million in the full year 2018, representing year-on-year decline of 12.2%.

71.     In Uxin's annual report for the fiscal year ended December 31, 2018, filed on Form 20-F with the SEC on April 29, 2019 (the "2018 20-F"), Uxin again attributed the decline in GMV

16

in the 2B business to the strategic shift in the 2B business.  Uxin also admitted that the decision

to eliminate Check Auto for C2B transactions may have material and adverse effects:

> Starting in the second half of 2018, we have taken an alternative approach that connects these consumers with quality dealers on our platform without us providing inspection and other services directly.  As a result, the GMV for our 2B business decreased by 12.1% from RMB17.4 billion in 2017 to RMB15.3 billion (US$2.2 billion) in 2018.  *Such adjustment may not achieve expected results and may have a material and adverse impact on our financial condition and results of operation.*

(emphasis added)

72.      Such a major change to Uxin's business strategy, which included the elimination

of a highly-touted component of Uxin's offerings (*i.e.* Check Auto), was not a decision that

happened abruptly.  The IPO occurred on June 27, 2018, and Uxin disclosed the substantial

change to its business on August 22, 2018, less than two months after the IPO.

73.      Plaintiffs' investigator interviewed a former appraiser at Uxin ("CW1").  CW1

worked as a used car appraiser at Uxin from October 2015 to August 2018.  CW1's job duty was

to appraise the price of used cars to be sold on Uxin's platform.

74.      According to CW1, approximately one month before the IPO, there were already

widespread rumors at Uxin that Uxin was going to change the C2B business and that there would

be massive staff reductions in the C2B business line.  Per CW1, while official notices of

termination did not go out to the affected employees until August 2018, many Uxin employees

already heard through the grapevine that Uxin was laying the grounds for mass termination of

C2B employees.

Inflation of Transaction Volume and GMV

75.      In the Registration Statement, Uxin touts itself as the "largest used car e-commerce

platform in China" in terms of transaction volume and GMV.

17

76.     Uxin boasted about its transaction volume and GMV in the Registration Statement: "The total number of used cars sold through our platform has increased from 377,777 in 2016 to 634,317 in 2017, representing a 67.9% increase, and from 102,098 in the first three months of 2017 to 165,003 in the first three months of 2018, representing a 61.6% increase. The total GMV of our platform has grown from RMB26.0 billion in 2016 to RMB43.4 billion (US$6.9 billion) in 2017, representing a 67.0% increase, and from RMB7.9 billion in the first three months of 2017 to RMB11.6 billion (US$1.9 billion) in the first three months of 2018, representing a 47.8% increase."

77.     The Registration Statement included this chart showing the growth in transaction volume and GMV:

| | Year Ended December 31 | | Three Months Ended March 31, | |
|---|---|---|---|---|
| | 2016 | 2017 | 2017 | 2018 |
| **Summary Operating Data:** | | | | |
| **Transaction volume (in units)** | **377,777** | **634,317** | **102,098** | **165,003** |
| 2C | 130,076 | 283,829 | 48,818 | 101,425 |
| 2B | 247,701 | 350,488 | 53,280 | 63,578 |
| **GMV (in RMB millions)** | **25,987** | **43,394** | **7,878** | **11,642** |
| 2C | 15,674 | 26,016 | 5,163 | 8,565 |
| 2B | 10,313 | 17,378 | 2,715 | 3,077 |
| Number of used car loans facilitated (in units) | 59,177 | 126,419 | 25,369 | 45,539 |
| Amount of used car loans facilitated (in RMB millions) | 6,199 | 13,065 | 2,736 | 4,677 |

78.     The transaction volume and GMV disclosed in the Registration Statement, however, are inflated – and essentially meaningless - because they count as Uxin transactions *all* third-party transactions processed using Uxin's POS (Point of Sale) software[3], including those

---

[3] A Point of Sale (POS) software is a software that vendors use to "ring up" transactions and process payments.  It is essentially a modern replacement for old-fashioned cash registers.

transactions that were ***not*** facilitated by Uxin's 2B or 2C platforms and from which Uxin derived no actual revenue.

79.     On April 16, 2019, the analyst firm J Capital Research USA LLC issued a research report (the "J Cap Report") revealing that in the Registration Statement, Uxin overstated transaction volume and GMV in part by recording third-party transactions processed using Uxin's POS as actual Uxin transactions.

80.     The J Cap Report is supported by numerous interviews with dealers and former Uxin employees.  An analyst following Uxin writing for the financial services website The Motley Fool found the J Cap Report to be "detailed and thorough."

81.     According to the J Cap Report, Uxin provides POS to dealers and then subsidizes all fees associated with the use of Uxin's POS.

82.     While Uxin unsurprisingly issued a quick denial on April 22, 2019 to the findings in the J Cap Report, Uxin's later disclosures confirm the accuracy of J Capital's findings.

83.     Uxin's 2018 20-F disclosed for the first time that Uxin's reported GMV included "certain free-of-charge intraregional transactions we facilitate…"

84.     On June 10, 2019, in connection with its earnings release for the first quarter of 2019, Uxin disclosed that, beginning with the first quarter of 2019, "Uxin will only disclose the transaction volume and corresponding GMV for the transactions which generate revenue."

85.     As a result, Uxin's transaction volume and GMV declined precipitously. Using the revised measure of only including transactions that actually generate revenue, Uxin's first quarter 2019 transactions "increased to 78,227 units representing year-over-year growth of 39.6%."  This means that Uxin's actual 2C transaction volume was only 56,035 units for the first quarter of 2018 – a far cry from the 101,425 units disclosed in the Registration Statement.

86.     Similarly, the June 10, 2019 earnings release reported that "GMV for the 2C business increased to RMB8,892 million in the first quarter of 2019, representing year-over-year growth of 61.5%."  This means that the actual 2C GMV for the first quarter of 2018 was RMB5,505 million – compared to RMB8,565 million as claimed in the Registration Statement.

87.     The following chart summarizes the first quarter 2018 2C transaction volume and GMV that Uxin claimed in the Registration Statement, and the true first quarter 2018 2C transaction volume and GMV under Uxin's revised metric counting only the transactions and GMV that actually generated revenue:

| Transaction Volume Claimed in Registration Statement | Actual Transaction Volume | % Overstated |
|---|---|---|
| 101,425 cars | 56,035 cars | 44.7% |

| GMV Claimed in Registration Statement | Actual GMV | % Overstated |
|---|---|---|
| RMB8,565 million | RMB5,505 million | 35.7% |

88.     Indeed, nothing in the Registration Statement disclosed that almost half of Uxin's supposed industry-leading "transaction volume" produced zero revenue, or that over one-third of Uxin's GMV produced no revenue.  This fact was material to investors because it renders meaningless (as well as misleading) Uxin's claim that it's the largest used car e-commerce platform in China as measured by transaction volume and GMV.

89.     Accurate transaction volume and GMV figures are also important to investors because Uxin stated in the Registration Statement that one of the "special factors" affecting its business is the "ability to increase our transaction volume and GMV" and that the Company's revenue growth will "depend largely on the increase of transaction volume on our platform."

90.     Following the publication of the J Cap Report, Uxin ADSs closed at $1.95 per ADS on April 16, 2019, representing a 78% decline from the price at which Uxin ADSs were sold to the investing public less than ten months earlier in the IPO.

Failure to Disclose that Uxin Itself Buys Cars to Resell

91.     In the Registration Statement, Uxin touts itself as operating an e-commerce platform that facilitates used car transactions.  Indeed, the Registration Statement states that consumers and dealers use Uxin's platform to buy and sell cars because of the numerous and unique services that Uxin's platform offers.

92.     The J Cap Report found that rather than operating a platform that attracts sellers to list their cars there, and buyers to shop for cars there, Uxin itself goes around buying used cars to sell on its own platform.  According to J Capital's interview with former Uxin employees, approximately 5% of Uxin's used car inventory listed on the platform consisted of cars that Uxin itself purchased for resale.

93.     An article that appeared on a Chinese financial news website, Southern Finance Net, dated March 22, 2017 and titled "Inflated by Half: Uxin's Financial Data is Being Questioned" (the "Southern Finance Article")[4] supports J Capital's findings.  According to the Southern Finance Article, former Uxin employees said that the job duties of Uxin's auto inspectors were not just limited to inspecting cars, but also includes finding used cars to buy for Uxin.  The Southern Finance Article states that in 2016, Uxin purchased 150,000 used cars, and

---

[4] Available at: http://news.nfcjw.com/2017/0322/534.html.  Last Accessed: October 25, 2019.

that Uxin's target for 2017 was to purchase 200,000 cars.  An English translation of the Southern Finance Article is attached as Exhibit 2.

94.     Given that Uxin's Registration Statement claimed a total transaction volume of 377,777 cars in 2016, the 150,000 used cars that Uxin itself purchased in 2016 to sell on its platform accounted for 39% of Uxin's total 2016 transaction volume.  And if Uxin purchased 200,000 used cars to list and sell on its platform in 2017, that would account for 31% of Uxin's claimed total transaction volume of 634,317 cars in 2017.  The actual proportion is even higher because Uxin's 2016 and 2017 transactional volume included those transactions from which Uxin generated no revenue.

95.     CW1 also confirmed the Southern Finance Article, telling Plaintiffs' investigator that during his time at Uxin, Uxin's C2B business model relied heavily on Uxin buying cars from individuals and then selling them to dealers. Indeed, his job duty was to appraise the value of used cars that Uxin wanted to buy to list and sell on its platform.  According to CW1, Uxin's appraisal department regularly appraises approximately 1,000 used cars per day for potential purchase by Uxin.

96.     None of this was disclosed in the Registration Statement.  In fact, the notion that Uxin buys used cars to list and sell on its platform runs counter to the business model that is presented in the Registration Statement.  According to the Registration Statement, Uxin operates a *platform*, and consumers and dealers transact on Uxin's platform because of its unique features such as Check Auto.  Nowhere in the Registration Statement did it say that Uxin itself is a used car dealer.  Indeed, this would change Uxin's business model from being an e-commerce platform to being a dealer holding inventory – a fundamentally different and lower value business.

## STATUTORY FRAMEWORK APPLICABLE TO THE REGISTRATION STATEMENT

**Item 303 Requirements**

97.     Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the issuer's future revenue.

98.     Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *See S.E.C. Release No.* 6835, 1989 WL 1092885, at *4; 17 C.F.R. §229.303(a)(3)(ii).

99.     Even a one-time event, if "reasonably expect[ed]" to have a material impact on results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  *S.E.C. Release No.* 6835, 1989 WL 1092885, at *4.  Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *Id.* at *3.  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition…with particular emphasis on the registrant's prospects for the future.  *Id.* at *3, 17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations,* S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

**Item 503 Requirements**

100.     Item 503 is intended to "provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."  *Sec. Offering Reform,* S.E.C. Release No. 8501, 2004 WL 2610458, at *6 (Nov. 3, 2004).  Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. §229.503(c).  The discussion of risk factors: must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell investors how risks may affect their investment.  *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

## THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT

101.     Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement.  15 U.S.C. § 77k(a)(5).

102.     Section 12 of the Securities Act provides that any person who "offers or sells a security [...] by means of a prospectus or oral communication, which includes an untrue statement of a material fact" or omission of a material fact is liable.  15 U.S.C. § 77l(a)(2).

103.     The Underwriter offered or sold Uxin ADSs.  The Prospectus indicated that Uxin engaged Morgan Stanley, Goldman Sachs, J.P. Morgan, China International, and China Renaissance to conduct the IPO.

104.     Both Section 11 and Section 12 provide that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

105.    It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13, *available at* <http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last visited October 25, 2019).   Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

106.    As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement.   To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process.   In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

107.    It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

108.    It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for Uxin's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

109.    In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers."   Underwriters

control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, the investment bank Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

110.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting Uxin's ADSs. Indeed, without an investment bank having performed a reasonable due diligence

investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

111.   Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading.  This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

112.   The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied.  The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value.  The due diligence process is just the opposite.  The investment bank should act as a "devil's advocate" by digging and probing within a company.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

113.   An issuer's financial health, including the issuer's total assets and whether the issuer was embroiled in lawsuits, are all material facts requiring inquiry and independent verification by underwriters.  With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking of litigation involving the issuer, it is

accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well as independently verifying information with third parties.

114.   Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor – separately, and not together, or in addition to being together.  All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed, with follow-up questioning if deemed necessary.

115.   The Underwriters did not conduct anything close to a reasonable due diligence investigation in regard to Uxin's IPO.  In particular, the Underwriters, had they performed proper due diligence, would have discovered that Uxin's transaction volume and GMV were inflated misleading because they contained transactions that generate zero revenue, that Uxin's business model included Uxin itself buying hundreds of thousands of used cars to sell on its platform, and that Uxin was embarking on a plan to curtail its 2B business, including eliminating Check Auto services for C2B transactions.  A reasonable due diligence would have uncovered these facts.

116.   As a result of the Underwriters not performing a reasonable due diligence investigation and/or not performing any due diligence investigation, the Prospectus misrepresented material information and omitted material information, rendering it misleading.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased Uxin ADSs from June 27, 2018 through April 15, 2019, inclusive.[5]

118.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Uxin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

120.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

121.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

---

[5] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of Uxin at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

b)       whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

c)       to what extent the members of the Class have sustained damages and the proper measure of damages.

122.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violations of §11 of the Securities Act
### Against All Defendants

123.     Plaintiffs repeat and re-allege the foregoing contained above, except any allegation of fraud, recklessness or intentional misconduct.

124.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

125.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

126.     The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

127.     Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

128.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

129.    The Underwriters owed to the holders of the ADS acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

130.    Plaintiffs acquired Uxin ADSs pursuant to the Registration Statement.

131.    At the time of their purchases of Uxin ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

132.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of §12(a)(2) of the Securities Act**
**Against the Underwriters and Dai**

133.    Plaintiffs repeat and re-allege the foregoing contained above, except any allegation of fraud, recklessness or intentional misconduct.

134.    The Underwriters and Dai were sellers, offerors, and/or solicitors of purchasers of Uxin ADSs offered pursuant to the Prospectus.

135. By means of the Prospectus, and by using the means and instrumentalities of transportation and communication in interstate commerce and of the mails, the Underwriters and Dai offered and sold Uxin ADSs to Plaintiffs and the other members of the Class.

136. The Prospectus contained untrue statements of material fact and failed to disclose material facts, as detailed above. The Underwriters and Dai owed Plaintiffs and other members of the Class who purchased Uxin ADSs pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Underwriters and Dai, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

137. Neither Plaintiffs nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they purchased Uxin ADSs.

138. This action was brought within one year after the discovery of the omissions and misstatements contained in the Prospectus, or after such discovery should have been made by the exercise of reasonable diligence, and within three years after the sale of Uxin ADSs pursuant to the Prospectus. It is therefore timely.

139. Plaintiffs and the other members of the Class hereby tender their Uxin ADSs and seek consideration paid therefore with interest thereon, or seek damages to the extent permitted by law.

## COUNT III
### Violations of §15 of the Securities Act
### Against the Individual Defendants

140.     Plaintiffs incorporate all the foregoing by reference, except any allegation of fraud, recklessness or intentional misconduct.

141.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of Uxin during the relevant period.

142.      The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

143.     None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

144.     Plaintiffs and the Class have sustained damages.  The value of Uxin ADSs has declined substantially due to the Securities Act violations alleged herein.

145.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

### EXCHANGE ACT CLAIMS

**Allegations Supporting Inference of Scienter**

146.     On April 22, 2019, less than a week after the publication of the J Cap Report, Uxin issued a press release categorically denying J Cap's allegations.  That Uxin doubled down on the misrepresentations after they were brought to light supports a strong inference of scienter.

147.    Specifically, regarding the allegation that Uxin itself buys used cars, Uxin falsely reiterated: "Uxin has always served as a transaction platform which enables dealers to conduct used car business more efficiently in China, and the Company does not take used car inventory."

148.    According to CW1, part of the reason Uxin decided to curtail its C2B business was because Uxin was buying used cars at higher prices than what Uxin was ultimately able to sell them for to dealers.  CW1 knew this because he worked as an appraiser and his job duty was to appraise the value of used cars that Uxin wanted to buy.

149.    Uxin's denial of J Cap's allegations indicated that Uxin's top executives, including Defendants Dai and Zeng, were either sufficiently aware of the subject matter of the J Cap Report, or that they were severely reckless in being unaware of those important facts, to be in a position to issue a denial.

150.    It is inconceivable that Uxin's CEO and CFO did not know that Uxin was buying hundreds of thousands of used cars to list and sell on its platform.  This is a significant expenditure that management must have approved.

151.    Uxin repeatedly touted itself as the "largest" used car e-commerce platform in China in terms of transaction volume and GMV.  Given Uxin's emphasis on transaction volume and GMV, it is inconceivable that Uxin did not know that the transaction volume and GMV included bogus transactions that were merely processed using Uxin's POS but were not actual Uxin transactions (thus earning no revenue for Uxin).

152.    Plaintiffs' investigator interviewed a former Uxin salesperson ("CW2") who was responsible for promoting Uxin to dealers.  CW2 was employed at Uxin from October 2016 to November 2017 and was based in Guangdong Province.  CW2 told Plaintiffs' investigator that Uxin would give kickbacks to dealers who agreed to use Uxin's POS system.

### *Respondeat Superior* **and Liability under Section 20 of the Exchange Act**

153.    Uxin is liable for the acts of the Defendants Dai and Zeng and Uxin's employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

154.    The scienter of Defendants Dai and Zeng and other employees and agents of the Company is similarly imputed to Uxin under *respondeat superior* and agency principles.

### **PLAINTIFFS' FRAUD-ON-THE-MARKET ALLEGATIONS**

155.    In pursuing the Section 10(b) claim, Plaintiffs will rely in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Uxin ADSs were traded in efficient markets during the Class Period.

156.    Uxin's ADSs traded in efficient markets during the Class Period for the following reasons: (i) the ADSs were traded on NASDAQ; (ii) on average shares representing more than 2.0% of the total ADSs outstanding were traded weekly during the Class Period; (iii) Uxin met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (iv) As a public issuer, Uxin filed periodic reports with the SEC; (v) Uxin regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vi) Uxin was followed by at least four securities analysts employed by

major brokerage firms, including Goldman Sachs, Morgan Stanley, J.P. Morgan, and Credit Suisse, who wrote reports that were widely distributed and publicly available; (vii) More than ten market makers made a market in Uxin ADSs during the Class Period; (vii) the price of Uxin ADSs responded quickly to incorporate and reflect new public information concerning Uxin during the Class Period.

157.    Based on the foregoing, the market for Uxin ADSs promptly digested current information regarding Uxin from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

158.    Alternatively, in pursuing their Section 10(b) claim, Plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

### COUNT IV
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Uxin, Dai, and Zeng

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

160.    This Count is asserted against Uxin, Dai, and Zeng and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

161.    During the Class Period, Uxin, Dai, and Zeng, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

162.    Uxin, Dai, and Zeng violated §10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

163.    Uxin, Dai, and Zeng acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

164.    Dai and Zeng, who are the senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and Class.

165.    As a result of the foregoing, the market price of the Company's ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Uxin, Dai, and Zeng's statements, Plaintiffs and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's ADSs during the Class Period in purchasing the Company's ADSs at prices that were artificially inflated as a result of Uxin, Dai, and Zeng's false and misleading statements.

166.    Had Plaintiffs and members of the Class been aware that the market price of the Company's ADSs had been artificially and falsely inflated by Uxin, Dai, and Zeng's misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's ADSs at the artificially inflated prices that they did, or at all.

167.    As a result of the wrongful conduct alleged herein, Plaintiffs and members of the Class have suffered damages in an amount to be established at trial.

168.    By reason of the foregoing, Uxin, Dai, and Zeng have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's ADSs during the Class Period.

169.    This action was filed within five years of each Class member's purchase of Uxin ADSs and within two years of the discovery of the Defendants' fraudulent statements.  It is therefore timely.

## COUNT V
### Violation of Section 20(a) of The Exchange Act
### Against Dai and Zeng

170.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

171.    During the Class Period, Dai and Zeng participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

172.    As officers and directors of a publicly owned company, Dai and Zeng had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

173.    Because of their positions of control and authority as senior officers, Dai and Zeng were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Dai and Zeng exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. Dai and Zeng therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's ADSs.

174.    Dai and Zeng, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, Dai and Zeng had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Dai and Zeng exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

175.    This action was filed within five years of each Class member's purchase of Uxin

ADSs and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

176. By reason of the above conduct, Dai and Zeng are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a) Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b) Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c) Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

(d) Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: October 25, 2019                                Respectfully submitted,

                                                       **THE ROSEN LAW FIRM, P.A.**

                                                       By: /s/Phillip Kim
                                                       Phillip Kim
                                                       Laurence M. Rosen
                                                       Yu Shi
                                                       275 Madison Ave, 40th Floor
                                                       New York, NY 10016
                                                       Telephone: (212) 686-1060

Fax: (212) 202-3827
Email: pkim@rosenlegal.com
       lrosen@rosenlegal.com
       yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*


**THE SCHALL LAW FIRM**
Brian Schall, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 25, 2019, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Phillip Kim_____