UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PATRICK MACHNIEWICZ, individually and
on behalf of all others similarly situated,

                     Plaintiff.,

              vs.

UXIN LIMITED, KUN DAI, ZHEN ZENG,
RONG LU, JULIAN CHENG, DOU SHEN,
HAINAN TAN, MORGAN STANLEY & CO.
INTERNATIONAL PLC, GOLDMAN SACHS
(ASIA) L.L.C., J.P. MORGAN SECURITIES
LLC, CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG SECURITIES
LIMITED, and CHINA RENAISSANCE
SECURITIES (HONG KONG), LIMITED,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

19-cv-822 (MKB) (VMS)

**Oral Argument Requested**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................ 3

LEGAL STANDARD ....................................................................................................................... 9

I.   ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT
     ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION .................. 10

     A.   The Post-IPO Change to the 2B Business .......................................................... 11

          1.   Plaintiffs Identify No Statute or
               Regulation Requiring Disclosure ............................................................ 11

          2.   The Post-IPO Change to the 2B Business
               Could Not Have Retroactively Rendered
               the Registration Statement False or Misleading ..................................... 13

     B.   Uxin's Historical Financial and Operational Data ............................................. 14

          1.   Plaintiffs Cannot Rely on Allegations
               from the J Capital Report ....................................................................... 15

          2.   Uxin's Reported Transaction Volume
               and GMV Were Not False or Misleading ............................................... 16

          3.   Plaintiffs' Car Purchase Allegations Fail ............................................... 18

II.  ALL OF PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE
     THERE IS NO CAUSAL CONNECTION BETWEEN THE
     PURPORTED MISREPRESENTATIONS AND ANY LOSS ....................................... 20

     A.   Uxin's ADS Price Rose After the 2B Change Was Announced ......................... 20

     B.   Public Information Cannot Constitute a Corrective Disclosure ........................ 21

III. PLAINTIFFS' EXCHANGE ACT CLAIMS ALSO FAIL BECAUSE
     PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED SCIENTER ......................... 22

IV.  PLAINTIFFS LACK STANDING FOR THEIR SECTION 12(a)(2) CLAIMS ............. 24

V.   PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY .... 25

CONCLUSION ............................................................................................................................... 25

i

## TABLE OF AUTHORITIES

### CASES

*Altayyar v. Etsy, Inc.*,
 242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...............................................................................10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007)..................................................................................3, 22, 25

*In re Australia & New Zealand Banking Group Ltd. Securities Litigation*,
 No. 08 Civ.11278 (DLC), 2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................19

*Axar Master Fund, Ltd. v. Bedford*,
 308 F. Supp. 3d 743 (S.D.N.Y. 2018)..............................................................................12

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988)........................................................................................................22

*In re Bayou Hedge Fund Litigation,*
 534 F. Supp. 2d 405 (S.D.N.Y. 2007)...............................................................................22

*Board of Trustees of Ft. Lauderdale General Employees' Retirement System v. Mechel
 OAO*, 811 F. Supp. 2d 853 (S.D.N.Y. 2011) ...................................................................15

*Brody v. Transitional Hospitals Corp.*,
 280 F.3d 997 (9th Cir. 2002) ...........................................................................................19

*California Public Employees' Retirement System v. Chubb Corp.*,
 394 F.3d 126 (3d Cir. 2004)......................................................................................16, 19

*In re Canandaigua Securities Litigation*,
 944 F. Supp. 1202 (S.D.N.Y. 1996)..................................................................................12

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
 114 F. Supp. 2d 316 (D.N.J. 2000) ...................................................................................14

*Chan v. New Oriental Education & Technology Group Inc.*,
 Civ. No. 16-9279 (KSH) (CLW), 2019 WL 2865452 (D.N.J. July 3, 2019) ...............2, 15

*In re CIT Group, Inc. Securities Litigation*,
 349 F. Supp. 2d 685 (S.D.N.Y. 2004)...............................................................................14

*City of Livonia Employees' Retirement System v. Boeing Co.*,
 711 F.3d 754 (7th Cir. 2013) ...........................................................................................16

*Cortina v. Anavex Life Sciences Corp.*,
 No. 15-CV-10162 (JMF), 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ...................16, 17

*In re Cosi, Inc. Securities Litigation*,
   379 F. Supp. 2d 580 (S.D.N.Y. 2005)...............................................................................14

*Delfonce v. Eltman Law, P.C.*,
   No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249 (E.D.N.Y. Feb. 15, 2017), *aff'd*,
   712 F. App'x 17 (2d Cir. 2017) ........................................................................................3

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)........................................................................................................20

*In re Express Scripts Holdings Co. Securities Litigation*,
   773 F. App'x 9 (2d Cir. 2019) ..........................................................................................2

*Fila v. Pingtan Marine Enterprise Ltd.*,
   195 F. Supp. 3d 489 (S.D.N.Y. 2016)..............................................................................21

*Finocchiaro v. NQ Mobile, Inc.*,
   No. 15 Civ. 6385 (NRB), 2018 WL 1217728 (S.D.N.Y. Feb. 27, 2018) .........................11

*Gamm v. Sanderson Farms, Inc.*,
   944 F3d 455, 458 (2d Cir., 2019)....................................................................................18

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)..............................................................................23

*Gustafson v. Alloyd Co.*,
   513 U.S. 561 (1995)........................................................................................................24

*In re Hardinge, Inc. Securities Litigation*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010).............................................................................14

*In re Initial Public Offering Securities Litigation*,
   383 F. Supp. 2d 566 (S.D.N.Y 2005).................................................................................5

*Ironworkers Local 580--Joint Funds v. Linn Energy, LLC*,
   29 F. Supp. 3d 400 (S.D.N.Y. 2014)................................................................................16

*In re Jumei International Holding Ltd. Securities Litigation*,
   No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)....................................1, 13, 14

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001)............................................................................................22

*Kalnit v. Eichler*,
   85 F. Supp. 2d 232 (S.D.N.Y. 1999)................................................................................25

*In re Keyspan Corp. Securities Litigation*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .............................................................................23

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................................20, 21

*Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010).........................................................................................23

*Maresca v. Soufun Holdings Ltd.*,
    No. 2:15-cv-08508-CAS (JEMx), 2016 WL 6102318 n.2 (C.D. Cal. Oct. 18, 2016) ...............................................................................................................................17

*In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003).........................................................................................24

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...................................................................................................21

*In re Morgan Stanley Information Fund Securities Litigation*,
    592 F.3d 347 (2d Cir. 2010).................................................................................................10, 25

*North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)...................17

*N.J. Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
    No. 08 Civ 5653(PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ...........................25

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................................................18

*In re Omnicom Group, Inc. Securities Litigation*,
    597 F.3d 501 (2d Cir. 2010)...................................................................................................21, 22

*In re One Communications Corp.*,
    No. 07 Civ. 3905(LTS) (AJP), 2009 WL 857535 (S.D.N.Y. Mar. 31, 2009) ...................17

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)..........................................................................................13

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010).........................................................................................23

*In re Ply Gem Holdings, Inc. Securities Litigation*,
    135 F. Supp. 3d 145 (S.D.N.Y. 2015)..........................................................................................13

*Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.*,
    714 F. Supp. 2d 475 (S.D.N.Y. 2010).........................................................................................25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)....................................................................................9, 10

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)........................................................................................1, 13

*Shemian v. Research In Motion Ltd.*,
  No. 11 CIV. 4068 RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013)..............................12

*Sinay v. CNOOC Ltd.*,
  554 F. App'x 40 (2d Cir. 2014) ......................................................................................23

*In re Solarcity Corp. Securities Litigation*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ..............................................................................16

*In re Stac Electronics Securities Litigation*,
  89 F.3d 1399 (9th Cir. 1996) ..........................................................................................10

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017)..............................................................................................11

*In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)..........................................................................20, 21

*Steamfitters' Industries Pension Fund v. Endo International PLC*,
  771 F. App'x 494 (2d Cir. 2019) ..................................................................................11, 12

*In re Sterling Foster & Co. Securities Litigation*,
  222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...............................................................................25

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)..............................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................................................22

*In re UBS AG Securities Litigation*,
  No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)...........................5

**STATUTES**

15 U.S.C. § 78u-4(b)(2) ....................................................................................................1

**RULES**

Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure .........................................1

# REGULATIONS

17 C.F.R. § 229.303 ....................................................................................................11, 12

Defendants Uxin Limited ("Uxin" or the "Company"), Morgan Stanley & Co. International plc, Goldman Sachs (Asia) L.L.C., J.P. Morgan Securities LLC, China International Capital Corporation Hong Kong Securities Limited, and China Renaissance Securities (Hong Kong) Limited (collectively, "Defendants") respectfully submit this Memorandum of Law in support of their Joint Motion to Dismiss the Amended Class Action Complaint (ECF No. 19) (the "Complaint" or "AC") pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 101(b)(2) of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(2) ("PSLRA").[1]

## PRELIMINARY STATEMENT

Plaintiffs in this putative securities class action offer two equally flawed theories of liability against Uxin—China's largest used car e-commerce platform—and certain of its officers, directors and underwriters.  First, Plaintiffs allege quintessential fraud-by-hindsight, insisting that Uxin's June 2018 initial public offering ("IPO") materials were rendered false and misleading by Uxin's announcement *two months later* that it would be adjusting part of its business model *in the second half of 2018*.  Such allegations are patently insufficient, as the Second Circuit made clear decades ago.  *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir. 1996) (statements made in offering materials are "not rendered misleading by the company's subsequent consideration of an alternative plan").  Plaintiffs do not allege facts showing that Uxin had even considered, let alone decided on, the change in business model at the time of the IPO.  Nor do Plaintiffs identify any duty to disclose that decision even if it had been made.  "Allegations, like these, 'that defendants should have

---

[1]   Defendants Kun Dai, Zhen Zeng, Rong Lu, Julian Cheng, Dou Shen and Hainan Tan (collectively, the "Individual Defendants") and China International Capital Corporation Hong Kong Securities Limited have not been served.  Nevertheless, the Court still can dismiss the Complaint in its entirety.  *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.'" *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) (citation omitted).

Second, Plaintiffs parrot allegations from a short seller report attacking Uxin to claim that the IPO materials misrepresented certain financial and operational data. But the report—by J Capital Research—falls far short of the requisite particularity needed to plead a securities claim. J Capital, whose very purpose is to try to drive down the Company's stock price, relies primarily on anecdotes from anonymous former employees and online media in a scattershot attempt to manufacture problems with Uxin's business. Plaintiffs make matters worse by doubling down on J Capital's allegations without offering any independent investigation or corroborating factual allegations. While third-party sources, such as a short seller report or newspaper article, "can certainly alert investors to wrongdoing, 'the *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders.'" *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, Civ. No. 16-9279 (KSH) (CLW), 2019 WL 2865452, at *7 (D.N.J. July 3, 2019) (alteration in original) (quoting *Hershfang v. Citicorp*, 767 F. Supp. 1251, 1255 (S.D.N.Y. 1991)).

Additionally, even if Plaintiffs did allege an actionable misstatement or omission under either theory (and they do not), they allege no facts supporting an inference of scienter. Moreover, there is no causal connection between any of the purported misstatements and any purported loss: Uxin's ADS price *rose* on the day the change to its business model was announced, and the J Capital report was expressly based on only public information, which cannot constitute a corrective disclosure.

For these independent reasons, as shown below, Plaintiffs' claims should be dismissed.

2

## **STATEMENT OF FACTS**[2]

### A.   **Uxin's Business and June 2018 IPO**

Founded in 2011 and based in Beijing, Uxin is a leading national online used car dealer in China.  (Ex. A (Prospectus) at 1; AC ¶ 50.)  Uxin's business aims to mitigate the uneven distribution of car dealership across China "with its online platform that aims to connect buyers with used cars for sale all over China."  (AC ¶ 55.)

Uxin filed a prospectus dated June 27, 2018, with the SEC for its IPO, which formed part of the Registration Statement.  (AC ¶ 57.)  The Registration Statement explained that Uxin's platform consists of two businesses: (i) Uxin Used Car, also known as "2C" (i.e., sales directed *to consumers*) and (ii) Uxin Auction, also known as "2B" (i.e., sales directed *to businesses*— typically car dealers).  (Ex. A at 1; AC ¶ 51.)  The 2B business can be further broken down into a B2B segment (i.e., cars listed for auction by dealers and purchased by other dealers) and a C2B segment (i.e., cars listed for auction by consumers and purchased by dealers).  (*See* Ex. B (Q2 2018 Earnings Call) at 2; *see also* AC ¶¶ 5, 52.)

"Most of [Uxin's] revenues are derived from the fees [it] charge[s] from transactions on [its] platform, including transaction facilitation services and loan facilitation services in [its] 2C business, and transaction facilitation services in [its] 2B business."  (Ex. A at 23.)  The Registration Statement explained these revenue sources in detail:

---

[2]   The facts set forth herein are drawn from the well-pled allegations in the AC and "documents attached as exhibits or incorporated into the complaint by reference, matters of which judicial notice may be taken, [and] documents integral to the complaint." *Delfonce v. Eltman Law*, *P.C*., No. 16 Civ. 6627 (AMD) (LB), 2017 WL 639249, at *2 (E.D.N.Y. Feb. 15, 2017), *aff'd*, 712 F. App'x 17 (2d Cir. 2017).  The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund*, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  Exhibits cited herein are attached to the accompanying Affirmation of Robert A. Fumerton, dated January 10, 2020.

*2C business*

Our 2C business generates revenues from (i) transaction facilitation services, and (ii) loan facilitation services.

*Transaction facilitation revenue.* For each used car sold through our 2C business, we charge a transaction facilitation service fee that equals the higher of a certain percentage of the price of the car and a minimum fee. The transaction facilitation service fee is for services provided through our platform in connecting consumers with used car sellers, facilitating car sales to consumers and providing after-sale warranty. . . .

*Loan facilitation revenue.* We generate loan facilitation revenue primarily from the loan facilitation service fee we charge. For each consumer auto loan facilitated through our platform, we charge a loan facilitation service fee paid by the borrower at the beginning of the loan period. We charge service fees for loan facilitation services in connection with loans for both used cars and new cars. . . .

*2B business*

Our 2B business generates revenues from transaction facilitation services. We primarily charge the buyers a transaction facilitation service fee for connecting business buyers with used car sellers and facilitating car sales through our auction service as well as for the title transfer service that we provide. . . .

(Ex. A at 96.)  In 2017, the year prior to the IPO, "Uxin's 2B business accounted for 27% of total revenue."  (AC ¶ 52.)  The vast majority of 2B revenue came from transaction facilitation services, which accounted for 26.6% of total revenue in 2017.  (Ex. A at 96.)  Uxin completed its IPO on June 27, 2018, issuing 25,000,000 ADSs at $9.00 each.  (AC ¶ 6.)

**B.     In August 2018, Uxin Issues Its Q2 2018 Results and Announces an Upcoming Change to Its 2B Business**

On August 22, 2018—two months after the IPO—Uxin released its Q2 2018 results. (Ex. C (Q2 2018 Press Release).)  In the same press release, the Company also announced an upcoming change to its C2B business to be implemented in the second half of 2018, which is the focus of Plaintiffs' claims here:

[W]e historically provided inspection and other complementary services that enabled consumers to sell used cars through our 2B business. Starting in the second half of 2018, we will take an alternative approach that connects these consumers

4

with quality dealers on our platform without us providing inspection and other services directly. Due to this change to our service approach, we will no longer record the corresponding GMV [i.e., gross merchandise value for the C2B business], which has historically made an immaterial contribution to our overall business. Our B2B auction business remains unchanged.

(Ex. C at 2; AC ¶ 64.) On the accompanying earnings call, Uxin's CEO emphasized that "the change of business approach will mean that we w[ill] no longer include[] corresponding GMV from C2B service in future quarters" and the "2B business going forward will include only our B2B business." (Ex. B at 2.) There were no questions regarding the announcement during the call. (*Id.* at 4-7.)

In the two months following the IPO, Uxin's ADS price had decreased by approximately half. (Ex. D (Stock Price) at 7-8.) Nevertheless, investors reacted positively to the Q2 report and the announcement of the change to the 2B business, sending Uxin's ADS price up approximately 6% to $6.63 on the day of the release. (*Id.* at 7.) This built on a surge of 20% the day before in anticipation of the release. (*Id.*)[3]

### C.   In November 2018, Uxin Issues Its Q3 2018 Results, Including an Update on the Change to Its 2B Business

Uxin released its next quarterly results on November 19, 2018. This was the first quarter reflecting results from the change to its 2B business. (Ex. E (Q3 2018 Press Release); AC ¶ 10.) Because of this, overall 2B business was down 8.5% and 14.8% in year-on-year transaction volume and GMV, respectively. (Ex. E at 1; AC ¶¶ 10, 66.) But the B2B business, which now accounted for all of the 2B business, actually achieved 18.6% year-on-year growth in transaction volume and 13.3% year-on-year growth in GMV. (Ex. E at 3; AC ¶ 66.) Accordingly, despite

---

[3]   Courts "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." *In re Initial Public Offering Securities Litigation*, 383 F. Supp.2d 566 (S.D.N.Y 2005)(citation omitted).

the exclusion of 2B sales, overall transaction facilitation revenue for Uxin's 2B business was up 20.8% year-on-year, reaching $27.8 million.  (Ex. E at 3.)  Once again, there were no questions about the C2B change or its impact on Uxin's financial metrics during the accompanying earnings call.  (Ex. F (Q3 2018 Earnings Call) at 8-9.)  On the day of the release, Uxin's ADS price closed at $4.50, down from $5.10 the previous day.  (Ex. D at 5; AC ¶ 11.)

**D.    In December 2018, Uxin's ADS Price Rises and Then Falls by More Than 50 Percent for Reasons Unrelated to Plaintiffs' Claims Here**

In December 2018, Uxin's ADS price spiked dramatically then quickly returned to where it had started.  (Ex. D at 5.)  Specifically, between December 4, 2018 and December 19, 2018, Uxin's ADS price more than tripled from $2.86 to $9.55.  (*Id.*)  It then fell by more than half to $3.88 by January 2, 2019.  (*Id.*)  The chart below shows Uxin's ADS price from the IPO on June 27, 2018 through the filing of the first complaint in this action on February 11, 2019.



**E.    Following the December 2018 Stock Drop, Multiple Shareholders File Duplicative Securities Actions in State and Federal Court**

Plaintiffs do not claim that the sharp decline in Uxin's ADS price at the end of December 2018 was caused by the revelation of any prior misstatement or omission in Uxin's Registration

6

Statement.  Nevertheless, three weeks after the drop, various shareholders filed securities

complaints in state and in federal court, seeking to recover damages for the total decrease in

Uxin's ADS value since the IPO.  (*See* AC ¶ 90.)  All of these complaints were based solely on

the post-IPO change to the 2B business announced months earlier in August 2018.[4]

### F.      In March 2019, Uxin Issues Its Q4 and Fiscal Year 2018 Results

On March 14, 2019, Uxin announced its Q4 2018 and year-end financial results.  (Ex. G

(Q4/FY 2018 Press Release); AC ¶ 12.)  The Company explained that "[t]he transaction volume

for the 2B business decreased to 72,081 units in the fourth quarter of 2018, due to the

Company's change of approach in serving consumers with car-selling needs as disclosed in the

earnings release for the second quarter of 2018, as well as dealers' growing appetite for retail

transactions through the Company's 2C platform."  (Ex. G at 4; AC ¶ 12.)  As the chart below

shows, following the change to the C2B business described above, Uxin's 2C and total

transaction volume increased significantly while 2B transaction volume decreased both in

absolute terms and relative to the 2C business.



---

[4]     In addition to this Action, there is a parallel state court action asserting substantially the same claim in the New York Supreme Court captioned *In re Uxin Limited Securities Litigation*, No. 650427/2019 (N.Y. Sup. Ct. 2019) (Borrok, J.).  Defendants moved to dismiss that action in its entirety for failure to state a claim on September 10, 2019.  That motion was fully briefed as of October 3, 2019, and oral argument is scheduled for March 3, 2020.

On the accompanying conference call, Uxin's CEO explained that this shift was all part of the Company's plan:

> . . . the 2B revenue and the transaction [volume] has declined. But I want to mention that it's on our plan. It's our strategy, because we found that the 2C business is very, very big and [a] potential . . . golden mine. So we -- just to move all our resource and -- into the 2C business. . . .
>
> . . . [O]ur cross-region 2C business model is more attractive to our dealer[s], because traditional[ly], if the selling the car goes through our B2B, actually [the] dealer cannot get a very significant profit. They are now using the cross-country retail model, where they can achieve the better profit because we're helping them to find an end user, not just the wholesaler. So we say the trend is more and more dealers . . . move their . . . transaction[s] . . . from the B2B [] to our -- the cross-region model.

(Ex. H (Q4/FY 2018 Earnings Call) at 12-13.)

### G.      In April 2019, a Short Seller Attacks Uxin

On April 16, 2019—ten months after the IPO—short seller J Capital Research published a report on its website attacking Uxin for, among other things, supposedly "grossly inflat[ing] its transaction volume and GMV."  (AC ¶ 15; *see generally* Ex. I (J Capital report).)  The report expressly states that "all information contained herein . . . has been obtained from public sources." (Ex. I at 1.)  Specifically, it relies on anecdotes from a handful of anonymous current and former Uxin employees and complaints from internet articles and blogs.

As Plaintiffs acknowledge, Uxin promptly and publicly disputed the allegations in the J Capital report.  (AC ¶ 82; *see generally* Ex. J (Uxin's Response to J Capital Report).)  The Company explained "that the allegations in the Report are unfounded, and the Report contains numerous errors of fact, misleading speculations and malicious interpretations of events, and reflects a general misunderstanding of Uxin's business model and China's used car industry." (Ex. J at 1.)  It went on to provide a point-by-point rebuttal.  (*Id.* at 1-9.)

8

On the day J Capital released its report, Uxin's ADS price experienced a momentary drop, falling from $3.05 to $1.95, which presumably benefited J Capital's short position.  (Ex. D at 3; AC ¶ 25.)  It bounced back almost entirely the next day, rising 51% to $2.95.  (Ex. D at 3.) The rally continued the following day (April 18, 2019) with the price closing at $3.37, higher than before the J Capital report was issued.  (*Id.*)  Since then, it has ranged from $1.94 to $3.49. (*Id.* at 1-3.)

## LEGAL STANDARD

Plaintiffs assert claims under (i) Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of purchasers of Uxin ADSs pursuant or traceable to the Registration Statement in connection with Uxin's IPO; and (ii) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all purchasers of Uxin ADSs between June 27, 2018 (the date of the IPO) and April 15, 2019 (the "Class Period"), except those who purchased directly from the Underwriters at the offering price in the IPO.  (AC ¶ 1.) Because Plaintiffs' Securities Act claims "are premised on allegations of fraud," they are subject to the heightened pleading requirements of Rule 9(b) and must be alleged with particularity. *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).

Plaintiffs try to avoid their pleading burden by disclaiming any allegation of fraud.  (AC ¶¶ 123, 133, 140.)  However, these conclusory disclaimers do not trump Plaintiffs factual allegations, which show that all of Plaintiffs' claims do "sound in fraud."  (*Id.*)  The Second Circuit has explained that "while a plaintiff need allege no more than negligence to proceed under Section 11 and Section 12(a)(2), claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."  *Rombach*, 355 F.3d at 171.  (collecting cases).  Accordingly, the Second Circuit ruled that although "Plaintiffs assert that their Section 11 claims 'do[ ] not sound in fraud[,]'" "the wording and imputations of the complaint are classically associated with fraud:

9

that the Registration Statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts, and that 'materially *false* and *misleading* written statements' were issued." *Id.* at 172 (first alteration in original).

Plaintiffs here make identical allegations to those in *Rombach* and, importantly, rely on the same allegations for both their Securities Act and Exchange Act claims, the latter of which are, by definition, fraud claims. (*See, e.g.*, AC ¶ 125.) Plaintiffs' "nominal efforts [to disclaim fraud] are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996).

## ARGUMENT

### I. ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT ALLEGE ANY ACTIONABLE MISREPRESENTATION OR OMISSION

To state a claim under Section 11 or 12(a)(2) of the Securities Act, Plaintiffs must allege that the Offering Documents contained: (1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Similarly, to state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder, Plaintiffs must allege that Defendants: "'(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiffs' reliance was the proximate cause of its injury.'" *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 172 (E.D.N.Y. 2017) (Donnelly, J.), *aff'd* 731 F. App'x 35 (2d Cir. 2018) (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)).

10

Plaintiffs claim that Uxin's Registration Statement was false and misleading because it (i) did not disclose the future, post-IPO change to Uxin's 2B business, (ii) purportedly misrepresented Uxin's transaction volume and GMV, and (iii) did not disclose that Uxin purportedly bought cars itself to sell on its own platform.  As demonstrated below, each theory fails as a matter of law for multiple independent reasons.

### A.      The Post-IPO Change to the 2B Business Was Not Misleading

Plaintiffs' allegations regarding Uxin's 2B business fail to state a claim because the post-IPO change did not and could not have retroactively rendered anything in the Registration Statement false or misleading.  Plaintiffs do not even argue the Registration Statement's description of the 2B business was untrue at the time.  Rather, they fault Uxin for failing to predict and disclose the future change.  For such an omission to be actionable, Plaintiffs must identify a "statute or regulation requiring disclosure" or "a corporate statement that is otherwise inaccurate, incomplete, or misleading" absent disclosure.  *Finocchiaro v. NQ Mobile, Inc.*, No. 15 Civ. 6385 (NRB), 2018 WL 1217728, at *7 (S.D.N.Y. Feb. 27, 2018).  Plaintiffs fail to do either.

### 1.      Plaintiffs Identify No Statute or Regulation Requiring Disclosure

Plaintiffs assert that Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required disclosure here.  (*See* AC ¶ 63.)  Item 303 requires disclosure of a "trend" or uncertainty that is "both (1) known to management and (2) 'reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (citation omitted).

As a threshold matter, a "business strategy decision," like the change to the 2B business, "is not the type of disclosure Item 303 requires."  *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019), *see id.* at 496, 498 (Item 303 did not require

11

acquiring company to disclose alleged "secret plan" to "transform" target company's business model after acquisition). "The SEC 'has never gone so far as to require a company to announce its internal business strategies.'" *Id.* at 498 (citation omitted). Plaintiffs "may not circumvent the settled doctrine that there is no affirmative duty to disclose information by stretching the language of [Item] 303 beyond its legitimate scope." *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202, 1212 (S.D.N.Y. 1996) (strategic decisions, such as marketing and pricing plans, are outside the scope of Item 303).

Moreover, even if Item 303 did apply, Plaintiffs allege no facts showing that Defendants knew at the time of the Registration Statement that Uxin would adjust its 2B business ***after*** the IPO. "Because '[i]t is well established that securities laws do not impose a duty on corporate officials to be clairvoyant,' these claimed omissions are not actionable." *Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068 RJS, 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013)(citation omitted), *aff'd*, 570 F. App'x 32 (2d Cir. 2014). "Item 303 requires the registrant to disclose only those trends, events, or uncertainties that it actually knows of when it files the relevant report with the SEC." *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 758 n.90 (S.D.N.Y. 2018) (citation omitted), *appeal docketed*, No.19-1132 (2d Cir. Apr. 24, 2019).

Finally, Plaintiffs also fail to allege facts showing the change was reasonably likely to have material effects on [Uxin's] financial condition or results of operations. *See* 17 C.F.R. § 229.303. As Uxin's CEO explained in announcing the change, the C2B business "ha[d] historically made an immaterial contribution to [Uxin's] overall business." (Ex. C at 2; AC ¶ 64.) Plaintiffs point to year-on-year declines for certain 2B business metrics in subsequent quarters, but they ignore that in Q3 2018, the first quarter after the change, Uxin's B2B business, 2C business and overall business continued to grow. Most importantly, regardless of the actual

impact (or lack thereof), Plaintiffs allege no facts showing it was reasonably likely **at the time of the IPO** that the change would have a material effect.  *See In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 149826, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (rejecting "[c]omplaint, which contains no allegations that Defendants knew of the impending exit from the beauty-supplies marketplace at the time of the IPO, much less the probable effect of that exit on Jumei's share price").[5]

### 2.  The Post-IPO Change to the 2B Business Could Not Have Retroactively Rendered the Registration Statement False or Misleading

Additionally, Plaintiffs do not identify anything in the Registration Statement that was retroactively rendered false or misleading by the subsequent change in the 2B business.

As the Second Circuit has explained, statements in offering materials "simply reflect[ing] company policy at the time" and "not promises to maintain that policy in the future" are "not rendered misleading by the company's subsequent consideration of an alternative plan." *San Leandro*, 75 F.3d at 811.  Even statements of intent to continue a practice "cannot have misled a reasonable investor to believe that the company had irrevocably committed itself to one particular strategy, and cannot constitute actionable statements under the securities laws." *Id.* "Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering." *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 323 (D.N.J. 2000).  Plaintiffs cannot survive a motion to dismiss with "'backwards' pleading—an attempt to allege liability for disclosures not made because the material fact . . . had not even occurred as of the critical date." *Panther*

---

[5]  Plaintiffs' reference to Item 503 fails for the same reasons.  *See In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 154 (S.D.N.Y. 2015) (dismissing Item 503 claims that were derivative of Item 303 claims where plaintiff did not adequately plead that the omissions in question were the "most significant factors" that made the offering "speculative or risky").

13

*Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009). Courts routinely reject attempts to advance Securities Act claims based on post-IPO changes in business strategy. *See, e.g.*, *Jumei*, 2017 WL 95176, at \*4 (post-IPO exit from the beauty-supplies marketplace); *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 324 (W.D.N.Y. 2010) (post-IPO shift from distributors to direct sales); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d 580, 584-85 (S.D.N.Y. 2005) (post-IPO switch to franchising model); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (post-IPO revision of loan loss reserves).

Here, Plaintiffs rely on pure backwards-pleading. Plaintiffs claim the post-IPO change to the 2B business rendered general statements about Uxin's patented *Check Auto* inspection system in the Registration Statement false or misleading, but they do not allege any facts showing that the challenged statements were inaccurate at the time they were made. The announced change post-dates the Registration Statement and does not implicate the challenged statements in any event. *See Hardinge*, 696 F. Supp. 2d at 321 (omission must be "sufficiently connected to Defendants' existing disclosures to make those public statements misleading")(citation omitted). Uxin continues to perform its *Check Auto* inspections, and other ancillary services, for its entire 2C business, which has been the Company's strategic focus, as well as its B2B business. The Company's post-IPO change in strategy is simply not actionable under the Securities laws.

## B. Uxin's Historical Financial and Operational Data

Plaintiffs' remaining allegations—that the Registration Statement "inflated" Uxin's gross merchandise value ("GMV") and transaction volume and failed to disclose that Uxin allegedly buys cars to resell—likewise fail to adequately plead a misstatement. (AC ¶¶ 75-96.)

14

### 1.     Plaintiffs Cannot Rely on Allegations from the J Capital Report

As a threshold matter, Plaintiffs' allegations on these issues are based solely on the J Capital report, which was expressly intended to drive down Uxin's stock price.  (*See* Ex. I at 1 ("You should assume that as of the publication date of our reports and research, J Capital Research USA LLC may benefit from short positions a client has in all stocks . . . covered herein, and therefore stands to realize significant gains in the event that the price . . . declines.")).  Uxin vigorously disputed the report, (*see* Ex. J; AC ¶ 82), and has not restated any of its financial results.  Plaintiffs' allegations merely parrot the J Capital report without any substantial independent investigation or corroboration, which in itself is fatal.  *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("[T]he Court still need not consider parroted allegations for which counsel has not conducted independent investigation")(citation omitted), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014); *see also New Oriental*, 2019 WL 2865452, at *7 ("[T]he *complaint* must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." (citation omitted))

Moreover, the J Capital report itself is based on anonymous sources that are not described with the requisite particularity.  Allegations based on confidential witnesses must be "described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 880 (S.D.N.Y. 2011)(citation omitted), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).  This assessment "necessarily entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and

plausibility of the allegations, and similar indicia." *Cal Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004). Confidential witness allegations "require a heavy discount" because "[t]he sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent." *City of Livonia Emps. Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). The J Capital report provides none of this requisite factual detail, which alone is enough to discount both it and Plaintiffs' allegations taken from it.

### 2. Uxin's Reported Transaction Volume and GMV Were Not False or Misleading

Plaintiffs, relying on the J Capital report, first allege that Uxin overstated the transaction volume and GMV in its Registration Statement by including third-party transactions that utilized Uxin's Point of Sale ("POS") software but generated no revenue for the company. (*See* AC ¶ 78.) Plaintiffs claim this was false and misleading because in June 2019—***one year after the IPO***—Uxin changed its approach going forward to include only revenue-generating transactions in its GMV and transaction volume. (*See id.* ¶ 84.) This claim fails for several reasons.

Most fundamentally, this claim is once again pure fraud-by-hindsight. Uxin's subsequent decision to change how it calculates these non-GAAP operational metrics does not render its prior calculations false or misleading. *See Ironworkers Local 580--Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014) ("[Defendant] ultimately decided to change some of its formulas. Plaintiffs' effort to transform that business decision into some sort of admission that statements made in prior reporting periods were false and materially misleading is entirely misguided."); *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 1002 (N.D. Cal. 2017) ("SolarCity's decision to stop reporting metrics such as Nominal Contracted Payments does not show that the previous reporting of that metric was false or misleading."); *see also Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *8 (S.D.N.Y. Dec. 29,

16

2016) ("Plaintiffs plead no facts to suggest that the decision to change the way the company reported its investor relations expenses was motivated by fraudulent intent.").

Moreover, "there is no suggestion that Defendants had a duty to disclose their [GMV] in any particular manner." *Cortina*, 2016 WL 7480415, at *8. Because GMV is not governed by any specific reporting requirements, Plaintiffs' bare assertion that Uxin's reported figures rendered its Registration Statement misleading does not state an actionable claim. *See N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *12 (S.D.N.Y. Sept. 30, 2016) ("Unless Plaintiffs can show that MDC somehow misled investors about how it actually calculated [a non-GAAP metric], which they have not, there can be no claim for fraud."); *see also In re One Commc'ns Corp.*, No. 07CIV3905LTSAJP, 2009 WL 857535, at *10 (S.D.N.Y. Mar. 31, 2009) (dismissing complaint where plaintiff failed "to explain how the [non-GAAP metric] was incorrectly calculated"), *aff'd sub nom. One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75 (2d Cir. 2010).

Finally, notwithstanding the change in GMV and transaction volume calculations, Plaintiffs do not allege that any of Uxin's actual financial metrics, such as revenue, were ever inaccurate. As other courts have recognized, "GMV is not a measure of actual revenue [but] is used in e-commerce to represent the value of transactions being completed through an internet company's portal." *Maresca v. Soufun Holdings Ltd.*, No. 2:15-cv-08508-CAS (JEMx), 2016 WL 6102318, at *2 n.2 (C.D. Cal. Oct. 18, 2016); (*accord* Ex. J at 6 (Uxin explaining in response to the J Capital report that "GMV is not the Company's revenue. The Company only recognizes transaction facilitation service fees received as revenue in accordance with U.S. GAAP.")). Thus, even if Plaintiffs could point to some requirement that Uxin should have

17

excluded non-revenue generating transactions from GMV and transaction volume (and they cannot), any deviation would be immaterial in light of Uxin's accurately disclosed revenue and other financial metrics.

### 3.   Plaintiffs' Car Purchase Allegations Fail

Finally, Plaintiffs allege the Registration Statement was misleading because it failed to disclose that Uxin allegedly purchases and sells used cars through its own platform, rather than operating exclusively as an e-commerce platform.  (*See* AC ¶¶ 91-92.)  This claim fails for at least two separate and independent reasons.

First, Plaintiffs have not alleged particularized facts showing that Uxin does in fact purchase and sell used cars through its own platform.  As the Second Circuit recently confirmed, "when a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be pleaded with particularity." *Gamm v. Sanderson Farms, Inc.*, 944 F3d 455, 458 (2d Cir., 2019).  The underlying conduct here is not even alleged to be illegal, and Plaintiffs have not even attempted to allege it with the requisite particularity.

Instead, Plaintiffs cite only the J Capital report, a single Chinese news article and one purported confidential witness.  (AC ¶¶ 92-93, 95.)  Both the J Capital report and news article fail to support Plaintiffs' claim because they rely upon wholly unspecified confidential sources. Beyond identifying these sources as former Uxin employees, neither the J Capital report nor the news article specifies what positions the employees held or identifies their basis for acquiring knowledge of the matters alleged.  (*See* Ex. I at 16; Ex. 2 at 3.)  As a result, these confidential sources lack the necessary foundation to support Plaintiffs' allegations.  *See Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (noting confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position

18

occupied by the source would possess the information alleged"). And while Plaintiffs offer additional specificity regarding their own confidential witness (AC ¶¶ 73, 95), none of them offer particularized support for their claims. Plaintiffs' attempt to remedy this deficiency through sheer volume of allegations fails as a matter of law. *See Chubb*, 394 F.3d at 155 ("Cobbling together a litany of inadequate allegations does not render those allegations particularized . . . ").

Second, even if Plaintiffs' allegation that Uxin buys used cars for resale were credited, their claim still would fail because Plaintiffs have not adequately explained how this fact would render any statement in the Registration Statement false or misleading. The closest Plaintiffs come is suggesting that a used car business would "run[] counter" to Uxin's purported business model as an e-commerce platform. (*See* AC ¶ 96.) However, Uxin has never claimed to operate solely through its online platform. Indeed, the Registration Statement stated, "[i]n addition to our 2C and 2B businesses, we also generate revenues from other businesses, including salvage car business and dealer inventory financing business." (Ex. A at 145.) Uxin never claimed that its 2C and 2B platforms were its sole business or that it did not also buy and sell used cars. The statements Plaintiffs challenge do not state or imply anything about the sale of used cars. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (statement is not misleading if it neither "state[s] nor implie[s] anything regarding" the subject matter of the purported omission); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, No. 08 Civ.11278 (DLC), 2009 WL 4823923, at *8 n.11 (S.D.N.Y. Dec. 14, 2009) ("[W]here the Complaint has failed to explain why a particular statement is false or misleading, the defendants' motion to dismiss a claim based on that statement must be granted."). And as noted above, Uxin's reported financial metrics were entirely accurate. Plaintiffs' claims fail for these reasons as well.

19

**II.      ALL OF PLAINTIFFS' CLAIMS ALSO FAIL BECAUSE THERE IS NO CAUSAL CONNECTION BETWEEN THE PURPORTED MISREPRESENTATIONS AND ANY LOSS**

Separately, Plaintiffs' claims also fail because there is no causal link between any of the alleged misstatements and any purported loss.  The securities laws protect investors only "against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  In other words, the misstatement or omission must have "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiffs must affirmatively plead loss causation for their Exchange Act claims, and, although they do not have to do so for their Securities Act claims, those claims also should be dismissed where it is apparent on the face of the complaint that no "causal connection [exists] between the [alleged] misrepresentation and the drop in the value of the security." *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 595 (S.D.N.Y. 2011).  That is the case here.

**A.      Uxin's ADS Price Rose After the 2B Change Was Announced**

Plaintiffs cannot allege, much less establish, that the Registration Statement's alleged failure to describe the future change in the 2B business caused any loss because when the change was announced two months later, Uxin's ADS price ***increased*** by more than six percent.  (*See* Ex. D at 7.)  This was on top of a 20% increase the day before.  (*Id.*)  Thus, not only was the announcement a new development—as opposed to a correction of some prior misrepresentation—it could not possibly have caused Plaintiffs any financial loss because there was no loss.  Tellingly, no shareholder asserted any securities claims against Uxin for almost six months after the announcement.  It was only after Uxin's ADS price rose dramatically and then dropped more than 50% at the end of December 2018 for unrelated reasons that shareholders

20

filed suit.  Plaintiffs cannot link their allegations about the change to the 2B business to this unrelated stock drop.  *See Lentell*, 396 F.3d at 174.

The stock movement around Uxin's Q3 2018 and Q4 2018 results are also red herrings. (*See* AC ¶¶ 10-12.)  Uxin's ADS price fell approximately 11 and 17 percent, respectively, after the Company released its Q3 2018 and Q4 2018 results.  (*See id.* ¶ 11; Ex. D at 3, 5.)  But Plaintiffs make no attempt to disentangle the portions of these drops attributable to the 2B business as opposed to other operating results.  In any event, the parts of the earnings releases addressing the 2B business consisted of new information about the Company's performance long after the IPO, not corrections of any prior misrepresentation in the Registration Statement, and they did not all relate to the change in the C2B business that Plaintiffs challenge.  (*See, e.g.*, Ex. E at 1-2; Ex. G at 1, 4.)  Thus, "it is apparent on the face of the complaint that the alleged loss in not causally connected to the [alleged] misrepresentations at issue."  *State St. Bank*, 774 F. Supp. 2d at 588.

### B.  Public Information Cannot Constitute a Corrective Disclosure

Plaintiffs' allegations based on the J Capital report also fail because the report expressly states that "all information contained herein . . . has been obtained from public sources."  (Ex. I at 1.)  It is settled law that a "negative characterization of already-public information" does not qualify as a "corrective disclosure."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *accord Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 497 (S.D.N.Y. 2016); *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) ("[T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure.").  This is because the "the market price of shares traded on well-developed markets reflects all publicly available information."  *Basic Inc. v. Levinson*, 485 U.S.

21

224, 246 (1988).  If the information is already public, there can be no "materialization of the risk concealed by the fraudulent statement."  *Omnicom*, 597 F.3d at 511.

Here, the J Capital report is not and cannot be a corrective disclosure because it expressly acknowledges that "all information contained herein . . . has been obtained from public sources." (Ex. I at 1.)  Accordingly, as a matter of law, there can be no causal link between the allegations based on the report and any purported loss.  *See Omnicom*, 597 F.3d at 512.

## III.     PLAINTIFFS' EXCHANGE ACT CLAIMS ALSO FAIL BECAUSE PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED SCIENTER

In addition to the reasons above, Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act also fail because they do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—*i.e.*, scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007).  Scienter may be pled through particularized factual allegations showing (1) "motive and opportunity" to commit fraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)(citation omitted).  The inference of scienter must be "strong," *i.e.*, "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

Here, Plaintiffs do not even attempt to allege motive and opportunity.  Thus, their allegations of recklessness must be "correspondingly greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)(citation omitted).  To meet this standard, Plaintiffs have to "allege facts approaching *a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts*."  *In re Bayou Hedge Fund Litig.,* 534 F. Supp. 2d 405, 415 (S.D.N.Y. 2007), *aff'd sub nom. S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98 (2d Cir. 2009)(citation omitted). Plaintiffs "must *specifically identify* the reports or statements that are contradictory to the

22

statements made, or must provide specific instances in which Defendants received information that was contrary to their public declarations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011). Plaintiffs have not come close to meeting this standard.

Plaintiffs allege no facts showing that Uxin or the other Defendants knew anything in the Registration Statement was false or misleading at the time it was issued. Plaintiffs fail to identify any documentation or information sent to or from management that was "inconsistent with the statements made." *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011)(citation omitted). Instead, they assert that Uxin's denial of allegations in the J Capital report supports a strong inference of scienter and that it is "inconceivable" that Uxin's CEO and CFO were unaware of the purported issues in the report prior to the IPO. (*See, e.g.*, AC ¶¶ 146, 149-151.) But it is well settled that Plaintiffs cannot allege scienter, merely by claiming Defendants "must have known" something. *See, e.g.*, *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014) ("The District Court correctly concluded that [plaintiff] had not sufficiently pleaded scienter based on what [defendant] 'must have known.'"). Moreover, to the extent Plaintiffs rely on the CEO and CFO's positions at Uxin to allege they had access to information contrary to statements in the Offering Documents (AC ¶ 150), "[c]ourts in this Circuit have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce,* 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003) (allegations that defendants, "because of their high positions" as CEO and CFO, "undoubtedly knew of the problems" are "precisely the sort of vague conclusions that courts have rejected").

Plaintiffs' reliance on two confidential witnesses ("CW1" and "CW2") similarly fails to give rise to a strong inference of scienter.  According to CW1, identified as a used car appraiser from October 2015 to August 2018, "part of the reason Uxin decided to curtail its C2B business was because Uxin was buying used cars at higher prices than what Uxin was ultimately able to sell them for to dealers."  (AC ¶ 148.)  According to CW2, a Uxin salesperson from October 2016 to November 2017, "Uxin would give kickbacks to dealers who agreed to use Uxin's POS system."  (AC ¶ 152.)   Even accepting those vague assertions at face value, Plaintiffs do not allege CW1 or CW2 ever told *management* about these issues, and they do not implicate the challenged statements in the IPO disclosures in any event.  Plaintiffs allege no facts showing that Uxin's CEO or CFO actually directed, condoned or even knew about conduct alleged by the confidential witnesses.  Accordingly, there is nothing from which the Court could draw the requisite strong inference of scienter.

## IV.   PLAINTIFFS LACK STANDING FOR THEIR SECTION 12(a)(2) CLAIMS

Plaintiffs' Section 12(a)(2) claims fail for lack of any misstatement and lack of any causal connection between a misstatement and any loss, as described above.  Additionally, Plaintiffs lack statutory standing to assert a claim under Section 12(a)(2) because they do not allege that they purchased their ADSs directly from any Defendant or in the IPO, as opposed to acquiring them in the secondary market.  "An essential element of a Section 12(a)(2) claim is that the plaintiff purchased his/her shares directly from a seller who makes use of a false or misleading prospectus."  *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 255 (S.D.N.Y. 2003); *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) ("§12(2) liability [is] limited to public offerings.")

Here, Plaintiffs allege only that they purchased their ADSs "pursuant and/or traceable to" the Registration Statement (AC ¶ 1), which is insufficient to allege Section 12(a)(2) standing.

24

*See, e.g.*, *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ. 5653(PAC), 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010) ("The Complaint alleges only that Plaintiff purchased Certificates 'pursuant and traceable to' the Offering Documents. . . . This, however, is insufficient to assert standing for Section 12 claims."); *In re Sterling Foster & Co., Sec. Litig.*, 222 F. Supp. 2d 216, 244 (E.D.N.Y. 2002) (collecting cases).  Plaintiffs' Section 12(a)(2) claim can therefore be dismissed on this additional basis.

## V.      PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROL PERSON LIABILITY

Finally, because plaintiffs have failed to adequately plead primary liability under Sections 11 and 12(a)(2) of the Securities Act or Section 10(b) of the Exchange Act, their claims for control person liability under Section 15 and Section 20(a) also fail.  *See Morgan Stanley,* 592 F.3d at 358; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).  Further, Plaintiffs also improperly attempt to plead primary liability and control person liability as to the same defendants for the same conduct (AC ¶¶ 123-132, 140-145, 159-176), and they fail to allege how the Individual Defendants controlled or culpably participated in the alleged violations, which also warrants dismissal.. *See Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010).

**CONCLUSION**

For these reasons, the Consolidated Amended Complaint should be dismissed in its entirety with prejudice.

Dated: New York, New York
January 10, 2020

/s/ Robert A. Fumerton
Scott D. Musoff
(scott.musoff@skadden.com)
Robert A. Fumerton
(robert.fumerton@skadden.com)
Michael C. Griffin
(michael.griffin@skadden.com)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
Four Times Square
New York, NY 10036
Telephone:   (212) 735-3000
Facsimile:   (212) 735-2000

*Attorneys for Defendant Uxin Limited*

/s/ Jonathan Youngwood
Jonathan Youngwood
(jyoungwood@stblaw.com)
Janet A. Gochman
(jgochman@stblaw.com)
**SIMPSON THACHER &
  BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
Tel: (212) 455-2000
Fax: (212) 455-2502

*Attorneys for Morgan Stanley & Co.
International plc, Goldman Sachs (Asia)
L.L.C., J.P. Morgan Securities LLC and
China Renaissance Securities (Hong Kong)
Limited*