**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence Rosen
Yu Shi
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        yshi@rosenlegal.com

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK MACHNIEWICZ, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> UXIN LIMITED, KUN DAI, ZHEN ZENG, RONG LU, JULIAN CHENG, DOU SHEN, HAINAN TAN, MORGAN STANLEY & CO. INTERNATIONAL PLC, GOLDMAN SACHS (ASIA) L.L.C., J.P. MORGAN SECURITIES LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, and CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, <br><br> Defendants. | Case No: 1:19-cv-0822-MKB-VMS <br><br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS...................................................................................................... 2

    I.    Uxin's Business and the June 2018 IPO .......................................................................... 2

    II.   Less than Two Months after the IPO, Uxin Abruptly Announces a Major Change to its Business ........................................................................................................................ 3

    III.  J Capital Research Finds, and Uxin Admits, that Uxin's Transactional Volume and GMV were Inflated ..................................................................................................... 4

    IV. The Registration Statement Failed to Disclose that Uxin itself Purchases Used Cars to Sell on its Platform.................................................................................................... 6

ARGUMENT.......................................................................................................................... 7

    I.    The Complaint Adequately States a Claim under Sections 11 and 12(a)(2) of the Securities Act ............................................................................................................. 7

        A.   Legal Standard..................................................................................................... 7

        B.   Rule 9(b) Does Not Apply.................................................................................... 9

        C.   The Complaint Adequately Pleads Material Misrepresentation and Omission.......... 10

    II.   Defendants Fail to Satisfy Their Burden of Showing Negative Causation..................... 20

    III.  Plaintiffs Have Standing under Section 12(a)(2) ........................................................ 23

    IV. The Complaint Adequately Pleads Scienter................................................................. 23

    V.   The Complaint Adequately Pleads Control Person Liability ......................................... 25

CONCLUSION ..................................................................................................................... 25

## TABLE OF AUTHORITIES

**Pages**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995)...........................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......................................... 7

*Baker v. Latham Sparrowbush Assocs.*,
72 F.3d 246 (2d Cir. 1995)...........................................................................................25

*Barrie v. Intervoice-Brite, Inc.,*
397 F.3d 249 (5th Cir. 2005)........................................................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) .......................................... 8

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)........................................................................... 8

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)...........................................................................13

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976) .............................................. 8

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015)...........................................................................21

*Herman & MacLean v. Huddleston*,
459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) .............................................. 8

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012).......................................................................... 14

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005).......................................................................... 24

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)...........................................................................25

*In re Canandaigua Sec. Litig.*,
944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................................................. 20

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
No. CV 11-2768 PSG (SSX), 2012 WL 12893520 (C.D. Cal. Feb. 16, 2012) ....................... 22

*In re Cosi, Inc. Sec. Litig.*,
379 F. Supp. 2d (S.D.N.Y. 2005) ..................................................................................... 17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) .............................................................................................. 20

*In re Fuwei Films Sec. Litig.*,
634 F. Supp. 2d 419 (S.D.N.Y. 2009) ......................................................................... 20, 22

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................................................... 20

*In re Gilead Sciences Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ......................................................................................... 21

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
236 F. Supp. 3d 824 (S.D.N.Y. 2017) ............................................................................... 23

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
No. 14CV9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ................................................. 17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) .......................................................................................... 8, 9

*In re OSG Sec. Litig.*,
971 F. Supp. 2d 387 (S.D.N.Y. 2013) ............................................................................... 10

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) ............................................................................. 9, 10

*In re Sunbeam Sec. Litig.*,
89 F. Supp. 2d 1326 (S.D. Fla. 1999) ............................................................................... 24

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993) ................................................................................................ 19

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................................... 25

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ............................................................................. 9, 10

In *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Phillip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) ................................................................................................ 16

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ................................................................................................ 18

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) .............................................................................................. 23

*Levine v. AtriCure, Inc.*,
594 F. Supp. 2d 471 (S.D.N.Y. 2009) ............................................................................... 20

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ......................................................................................... 18, 19

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .............................................................................................. 21

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) ............................................................................... 14

*Meyer v. Jinkosolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) .............................................................................................. 12

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) .............................................................................................. 16

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................................... 17

*People v. Debt Resolve, Inc.*,
387 F. Supp. 3d 358 (S.D.N.Y. 2019) ............................................................................... 10

*Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance
Corp. I,*
No. 08 CV 1713 ERK WDW, 2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ...................... 25

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014) ............................................................................................. 16

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ................................................................................................ 9

*Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*,
771 F. App'x 494 (2d Cir. 2019) ....................................................................................... 19

iv

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) ................................................... 23, 24

*United States v. Quiroz*,
   13 F.3d 505 (2d Cir. 1993) ............................................................................................. 24

## Statutes

15 U.S.C. § 77k(a) ............................................................................................................. 9

Lead Plaintiff Saleh Doron Gahtan and Named Plaintiff Daniel Chiu (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in opposition to Defendants' Joint Motion to Dismiss the Amended Class Action Complaint.[1]

**PRELIMINARY STATEMENT**

Uxin Limited ("Uxin") operates an e-commerce platform that facilitates the purchase and sales of used cars in China.  In June 2018, Uxin became a publicly-listed company in the U.S. via an initial public offering ("IPO").  The IPO proved lucrative for Uxin, as it raked in more than $200 million from investors.

In the Registration Statement that Uxin issued to woo IPO investors, Uxin describes itself as the largest used car e-commerce platform in China, as measured by total number of transactions and the gross merchandise value ("GMV") of those transactions.  Uxin also touts its proprietary "300 check point" auto inspection service, known as Check Auto, which Uxin calls a "critical foundation" of its business and its competitive advantage in a cutthroat industry.

Unbeknownst to investors at the time of the IPO, Uxin was embarking on a plan to cease providing Check Auto services when consumers sell used cars to dealers on Uxin's platform ("C2B" transactions").  Uxin announced this change to its business model less than two months after the IPO.  Not surprisingly, this change negatively affected Uxin's business, and Uxin's stock price plummeted as a result.

The bad news did not stop there.  In April 2019, an analyst firm issued a research report revealing that Uxin's supposed industry-leading transaction volume and GMV were grossly inflated.  The analyst report also revealed that rather than operating an online platform

---

[1] Defendants Kun Dai, Zhen Zeng, Rong Lu, Julian Cheng, Dou Shen and Hainan Tan (the "Individual Defendants") are Chinese nationals residing in China.  Plaintiffs are currently in the process of serving the Individual Defendants in China through the Hague Service Convention.

connecting buyers and sellers of used cars, Uxin itself also purchases hundreds of thousands of used cars each year to sell on its platform. In other words, Uxin was also a used car dealer – a fundamentally different business with lower margins than the one described in Uxin's Registration Statement. These disclosures led to further substantial declines in Uxin's stock price, damaging investors.

## STATEMENT OF FACTS

### I.   Uxin's Business and the June 2018 IPO

Headquartered in Beijing, Uxin operates a used car e-commerce platform, facilitating the purchase and sales of used cars across China. ¶2.[2]  Uxin describes itself as China's largest used car e-commerce platform in terms of the number of transactions facilitated (*i.e.* transaction volume) and the total gross merchandise value, or GMV.[3] ¶3.

Uxin's platform consists of two businesses: Uxin Used Car (the "2C" business), which caters to consumer buyers, and Uxin Auction (the "2B" business), which caters to business buyers, *i.e.* dealers.  ¶51.  Uxin's 2B business is further broken down into two segments: B2B (dealers selling to other dealers) and C2B (consumers selling to dealers).  ¶52.  In 2017, Uxin's 2B business accounted for 27% of Uxin's total revenue.  *Id.*

On June 27, 2018, Uxin conducted an IPO in the U.S.  ¶57.  Uxin sold 25,000,000 shares at $9.00 per share, raising more than $209 million after underwriting fees.  ¶58.  As part of the IPO, Uxin filed a registration statement and prospectus (collectively, the "Registration Statement") with the U.S. Securities and Exchange Commission ("SEC").

---

[2] All citations to "¶_" refer to the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), ECF. No. 19.

[3] GMV refers to the gross merchandise value of used cars transacted on Uxin's platform, as measured by the gross selling price of used cars.

## II. Less than Two Months after the IPO, Uxin Abruptly Announces a Major Change to its Business

In the Registration Statement, Uxin repeatedly touts its proprietary "Check Auto" 300-point vehicle inspection service that enables Uxin to provide "comprehensive and accurate descriptions of vehicles on our platform." ¶¶60-61. Uxin's Registration Statement describes Check Auto as a "critical foundation" and "key feature" of Uxin's business, one that is "central to [Uxin's] platform." *Id.*

On August 22, 2018, less than two months after the IPO, Uxin announced a major overhaul of its 2B business; specifically, Uxin would cease providing Check Auto inspections for C2B transactions and drastically curtail its 2B business. ¶64. Uxin downplayed the impact this strategic shift would have on its business, stating that "[d]ue to this change to our service approach, we will no longer record the corresponding GMV, *which has historically made an immaterial contribution to our overall business*." ¶65.

But the impact of this change on Uxin's business was in fact significant, and the market finally began to learn of the extent of the impact on November 19, 2018, when Uxin announced its Q3 2018 financial results. Uxin revealed that transaction volume for its 2B business had decreased by 8.5% year-over-year, and GMV for its 2B business declined by 14.8% as compared to the same quarter last year. ¶63. Uxin attributed these negative results to the change to its 2B business model. *Id.* Following this news, Uxin share price fell by 11.7%.

The impact was even more drastic in Q4 2018, the first full quarter following Uxin's decision to cease providing Check Auto services for C2B transactions and shrink its 2B business. On March 14, 2019, Uxin announced its Q4 2018 financial results, and disclosed that transaction volume for the 2B business declined by 37.1% year-over-year. ¶69. GMV also declined by 40.2% in Q4 2018 compared to the same quarter in 2017. *Id.*

In Uxin's fiscal year 2018 annual report on Form 20-F issued on April 29, 2019, Uxin again attributed the decline in GMV for the 2B business to the change in its 2B business model, and admitted that the decision to eliminate Check Auto for C2B transactions may have a material, adverse impact on Uxin's financial performance.  ¶71.

Such a major change to Uxin's business model, which included the elimination of the highly-touted Check Auto service, was not made on a whim.  CW1, who worked at Uxin as a used car appraiser from October 2015 to August 2018, stated that approximately one month before the IPO, there were already widespread rumors at Uxin that Uxin would be making changes to the C2B business and conducting mass layoffs of C2B employees. ¶74.

### III. J Capital Research Finds, and Uxin Admits, that Uxin's Transactional Volume and GMV were Inflated

In marketing itself to investors, Uxin in its Registration Statement touts itself as the "largest used car e-commerce platform in China" based on its supposedly industry-leading transaction volume and GMV.  ¶¶75-76.  According to the Registration Statement, Uxin's transaction volume and GMV were not only tops in China, but also growing rapidly.  *Id.*

On April 16, 2019, the investment analyst firm J Capital Research USA LLC ("J Capital") issued a research report (the "J Cap Report") revealing that the transaction volume and GMV claimed in Uxin's Registration Statement are misleading.  According to the J Cap Report, Uxin provides Point-of-Sales (POS) software [4] free of charge to used car dealers, and to encourage dealers to use Uxin's POS to process all transactions – regardless of whether the transactions involve cars listed on Uxin's platform - Uxin subsidizes all fees associated with the use of Uxin's POS. ¶81.  Uxin then counts as its own transactions, and records the corresponding

---

[4] A POS software is a software that vendors use to "ring up" transactions and process payments - essentially a modern replacement for the old-fashioned cash register.

4

GMV of, all transactions processed using Uxin's POS, *including those transactions that were not facilitated by Uxin's 2B or 2C platforms* and from which Uxin derived no revenue. ¶¶78-79.

Less than a week later on April 22, 2019, Uxin issued a sweeping denial of J Capital's findings. ¶82. But Uxin's later disclosures confirmed that J Capital was correct. Uxin's 2018 20-F, filed on April 29, 2019, disclosed for the first time that Uxin's GMV included "certain free-of-charge" transactions. ¶83. Then, on June 10, 2019, in connection with its earnings release for Q1 2019, Uxin disclosed that beginning with Q1 2019, "Uxin will only disclose the transaction volume and corresponding GMV for the transactions which generate revenue." ¶84.

As a result, Uxin's transaction volume and GMV declined precipitously. Using the revised measure of only including transactions that generate revenue, Uxin's Q1 2019 transactions "increased to 78,227 units representing year-over-year growth of 39.6%." ¶85. Indeed, if the 78,227 units represents a 39.6% increase, then this means that Uxin's actual 2C transaction volume was only 56,035 units for Q1 2018 – a far cry from the 101,425 units touted in the Registration Statement. *Id.* A similar shrinkage occurred in reported GMV. The Q1 earnings release reported that "GMV for the 2C business increased to RMB 8,892 million in the first quarter of 2019, representing year-over-year growth of 61.5%." ¶86. This means that the actual 2C GMV for Q1 2018 was RMB 5,505 – compared to RMB 8,565 million as claimed in the Registration Statement. ¶86.

The following chart summarizes the first quarter 2018 2C transaction volume and GMV that Uxin claimed in the Registration Statement, and the true first quarter 2018 2C transaction volume and GMV under Uxin's revised metric counting only the transactions and GMV that actually generated revenue:

5

| Transaction Volume Claimed in Registration Statement | Actual Transaction Volume | % Overstated |
|---|---|---|
| 101,425 cars | 56,035 cars | 44.7% |

| GMV Claimed in Registration Statement | Actual GMV | % Overstated |
|---|---|---|
| RMB8,565 million | RMB5,505 million | 35.7% |

¶87.

Nothing in the Registration Statement disclosed that almost half of Uxin's "transaction volume" produced zero revenue, or that over one-third of Uxin's GMV produced no revenue. ¶88.

Following the publication of the J Cap Report, Uxin's share price closed at $1.95 per share on April 16, 2019, representing a 78% decline from the price at which Uxin shares were sold to investors less than ten months earlier in the IPO.  ¶90.

## IV.   The Registration Statement Failed to Disclose that Uxin itself Purchases Used Cars to Sell on its Platform

According to the Registration Statement, Uxin operates an online ***platform*** that facilitates used car transactions. Uxin's Registration Statement boasts that consumers and dealers use Uxin's platform to buy and sell used cars because of the unique services that Uxin offers, such as Check Auto and the ability to buy and sell cars all over China instead of only in a specific city. ¶¶54-56.

The J Cap Report, however, found that rather than operating a platform that attracts sellers to list their cars and buyers to shop for cars on Uxin, Uxin ***also buys used cars*** which it sells on its platform – in other words, Uxin itself is a used car dealer.  ¶92.

Chinese news media and Plaintiffs' investigator corroborated J Capital's finding. According to an article that appeared on the Chinese financial news website Southern Finance

6

Net (the "Southern Finance Article"), former Uxin employees said that Uxin auto inspectors were required to find used cars for Uxin to buy.  ¶93.  The Southern Finance Article stated that in 2016, Uxin purchased 150,000 used cars, and that it was targeting 200,000 used cars to purchase in 2017.  *Id.*  Given Uxin's claimed transaction volume of 377,777 cars in 2016, the 150,000 cars that Uxin itself purchased to sell accounted for 39% of Uxin's total 2016 transaction volume.  ¶94.  And if Uxin purchased 200,000 used cars to sell on its platform in 2017, that would account for 31% of Uxin's claimed total transaction volume of 634,317 cars in 2017.  *Id.*

That Uxin buys used cars to sell on its platform is corroborated by CW1.  According to CW1, during his time at Uxin, Uxin's C2B business model relied heavily on Uxin buying cars from individuals and then selling them to dealers.  ¶95.  Indeed, his job was to appraise the value of used cars that Uxin wanted to resell on Uxin's platform.  *Id.*  CW1 stated that during his time at the company, Uxin's appraisal department regularly appraised approximately 1,000 used cars each day for potential purchase.  *Id.*

None of this was disclosed in Uxin's Registration Statement. ¶96. According to the Registration Statement, Uxin operates an online platform, and consumers and dealers transact on Uxin's platform because of its unique features such as Check Auto.  *Id.* The Registration Statement did not state that Uxin was itself a used car dealer holding inventory – a fundamentally different, less profitable, and lower-value business with an entirely different set of risks.  *Id.*

## ARGUMENT

I.  **The Complaint Adequately States a Claim under Sections 11 and 12(a)(2) of the Securities Act**

A.  **Legal Standard**

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In determining whether a complaint states a claim that is plausible, courts are required to proceed "on the assumption that all the [factual] allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Even if their truth seems doubtful, "Rule 12(b)(6) does not countenance…dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556.

 Section 11 and Section 12(a)(2) of the Securities Act have "roughly parallel elements." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).  To state a claim under Section 11 and Section 12(a)(2), a plaintiff must show that a registration statement or prospectus:  "(1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading."  *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007).  Section 11 provides that any signer, director of the issuer, underwriter, preparing or certifying accountant may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a). In other words, pleading a false statement or omission of material fact is all that is required to state a claim under either Section 11 or Section 12(a)(2).

Section 11 places a "relatively minimal" burden on the plaintiff. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983) (liability under Section 11 for financials).  Section 11 is an express civil remedy and allows recovery for negligent conduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208–210 (1976).  Indeed, even innocent

misstatements are actionable under Section 11 of the Securities Act.  *See Herman & MacLean*, 459 U.S. at 381 n.11.

### B.  Rule 9(b) Does Not Apply

Claims under the Securities Act (*e.g*. Sections 11 and 12(a)(2)) are subject to the notice pleading standards of Rule 8.  *In re Morgan Stanley,* 592 F.3d at 358.  Defendants attempt to raise the pleading standard by erroneously asserting that Plaintiffs' Securities Act claims are "premised on allegations of fraud" and therefore subject to the heightened pleading requirements of Rule 9(b).  While Plaintiffs' allegations could be explained by fraud, they're also consistent with negligence on the part of Defendants; as such, Rule 8 applies.

Defendants cite *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) in support of their claim that the Complaint contains the "wording and imputation" associated with fraud, and therefore, the Complaint sounds in fraud. Defendants misread *Rombach.*  As several courts in this district have noted, Section 11 *requires* a plaintiff to allege materially untrue statements or omissions that render a document *false and misleading.  In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374–75 (S.D.N.Y. 2011).  Surely, "the Second Circuit did not intend *Rombach* as an instruction that all §11 pleadings should be subjected to the Rule 9(b) standard…. Nor can the Second Circuit have intended that all allegations directly reproducing the language of §11 be subject to Rule 9(b)." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 631–32 (S.D.N.Y. 2007).  Indeed, "mere use of the statutory language is itself insufficient to render a complaint one that 'sounds in fraud'." *In re Wachovia,* 753 F. Supp. 2d at 374-75.

Next, Defendants claim that the Securities Act claims must sound in fraud because Plaintiffs rely on the same set of facts for the Exchange Act claims, for which scienter is an element.  But it's well-established that Securities Act claims and Exchange Act claims can be

9

pled in the alternative.  Indeed, even if "it is clear that plaintiffs believe that [a defendant] and various persons associated with it, including most, if not all, of the defendants, were engaged in a massive fraud….[,] [t]his fact…does not take away plaintiffs' right to ***plead in the alternative*** that defendants violated provisions requiring only negligence." *In re Refco,* 503 F. Supp. 2d at 632-33.  (emphasis added). The same course of conduct that would support a securities fraud claim under the Exchange Act may also support a Section 11 or Section 12 claim.  *Id.*

While the Complaint includes a section alleging that Defendants acted with scienter, *see* ¶¶ 146-152, the Complaint clearly states that the scienter section is part of the "Exchange Act Claims" portion of the Complaint.  As such, the scienter allegations do not render the Complaint's Securities Act allegations as sounding in fraud.  *In re Wachovia,* 753 F. Supp. 2d at 374 (holding that a complaint's Securities Act claims do not sound in fraud when the complaint also pleads fraud under Section 10(b) because "Plaintiffs do, in fact, segregate their Securities Act claims into the final portion of the…Complaint, thereby drawing a distinction between negligence and fraud claims.").[5]

Even if the Court were to hold that Rule 9(b) applies, the Complaint satisfies the heightened pleading standards.  Rule 9(b) requires that a plaintiff: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent. *People v. Debt Resolve, Inc.*, 387 F.Supp.3d 358, 364 (S.D.N.Y. 2019).  The Complaint meets this requirement.

### C. The Complaint Adequately Pleads Material Misrepresentation and Omission

#### a. The Complaint Adequately Pleads that Uxin's Transaction Volume and GMV Disclosed in the Registration Statement were False and Misleading

---

[5] *see also, In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 397 (S.D.N.Y. 2013) ("Plaintiffs may plead Section 10(b) fraud and Section 11 negligence claims as alternatives").

The Complaint alleges that the transaction volume and GMV that Uxin claimed in the Registration Statement were false and misleading because they included transactions that didn't generate any revenue for Uxin.  ¶¶75-90.  These gratuitous transactions did not involve car listing on Uxin's platform and had nothing to do with Uxin other than the fact that they were processed, free of charge, with Uxin's POS.  *Id.*  The Complaint alleges that Uxin's transaction volume and GMV for the 2C business, as disclosed in the Registration Statement, were inflated by 44.7% and 35.7% for Q1 2018. *Id.*

Defendants concede that the Registration Statement included transaction volume and GMV for transactions that produced no revenue.  The remaining inquiry, then, is whether this is material and misleading to the average investor, and it absolutely is.  Uxin in the Registration Statement repeatedly touts its supposedly industry-leading transaction volume and GMV. Nothing in the Registration Statement suggests that nearly half of the transaction volume, and over one-third of the GMV, for the 2C business produced no revenue.  This fact is plainly material to investors because it renders meaningless – as well as misleading – Uxin's claim that it is the largest used car e-commerce platform in China as measured by transaction volume and GMV.  This is tantamount to a restaurant chain telling investors that it sold the most burgers out of any restaurant chain, when in actuality half of those burgers it supposedly sold were given away free-of-charge.   It's material information that any reasonable investors would find important in evaluating an investment in Uxin.

Accurate transaction volume and GMV figures are also important to investors because Uxin stated in the Registration Statement that one of the "special factors" affecting its business is the "ability to increase our transaction volume and GMV" and that Uxin's revenue growth will "depend largely on the increase of transaction volume on our platform."  ¶89.  The

Registration Statement also boasts of Uxin's rapidly-growing transaction volume and GMV. ¶76. These disclosures are entirely meaningless and misleading if a substantial amount of the transaction volume produces no revenue for Uxin. In that case, an increase in transaction volume would not necessarily lead to revenue growth, and investors are deceived when they attempt to assess the current and future profitability of Uxin's business from the inflated transaction volume and GMV numbers.

Defendants also argue that Uxin had no duty to disclose GMV in the first place. This is irrelevant. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250–51 (2d Cir. 2014). Indeed, once Uxin touts its purportedly "largest in China" transaction volume and GMV, it has a duty to tell the whole truth about its transaction volume and GMV – that they include a substantial number of transactions that don't produce any revenue for Uxin.

### b. The Complaint Adequately Pleads that Uxin Itself Purchases Used Cars to Sell on its Platform, in Contravention of the Business Model Disclosed in the Registration Statement

In its Registration Statement, Uxin describes itself as operating an online platform connecting buyers and sellers of used cars. It makes money from facilitating transactions and facilitating auto loans. ¶¶2-4. Yet, J Capital reported based on interviews with former Uxin employees and site visits that Uxin itself purchases used cars to sell on its platform. ¶92. In other words, rather than operating a platform like eBay, Uxin also holds inventory and is essentially a used car dealer – a fundamentally different business with a drastically different growth, profitably and risk profile. Both the Chinese media and Plaintiffs' investigator corroborated J Capital's finding. ¶¶93-95.

12

Defendants argue that the Complaint hasn't alleged with particularity that Uxin in fact purchases used cars to sell. But Securities Act claims are governed by Rule 8 notice pleading standards and particularity is not required. Even if the Court were to apply Rule 9(b), the Complaint meets the pleading standard. For example, the Complaint describes CW1 as a former used car appraiser who worked at Uxin from October 2015 to August 2018, and CW1's job responsibility was to appraise the value of used cars that Uxin wanted to purchase to list and sell on its platform. ¶¶73, 95. CW1 further stated that the Uxin's appraisal department – in which he worked - regularly appraises approximately 1,000 cars per day for potential purchase by Uxin. *Id.* Therefore, CW1 himself has direct knowledge of the fact that Uxin purchases large numbers of used cars to sell on its platform. *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (allegations based on confidential witness allowed so long as the witness is described with sufficient particularity to "support the probability that a person in the position occupied by the source would possess the information alleged."). Furthermore, CW1's statements are consistent with the J Capital's findings and the reports from the Chinese media. ¶¶92-93.

Defendants incredulously argue that even if Uxin did buy used cars to sell on its platform, it would not render any statement in the Registration Statement false or misleading, because Uxin also disclosed that it "also generate[s] revenue from other businesses, including salvage car business and dealer inventory financing." Def. Br. at 19.[6] But this does not come close to disclosing that Uxin buys and holds an inventory of used cars to sell on its platform, or that the number is so substantial that more than 30% of Uxin's claimed transaction volume in

---

[6] All citations to "Def. Br. at _" refer to the Memorandum of Law in Support of Defendants' Joint Motion to Dismiss.

2016 and 2017 was from used cars that Uxin itself purchased to sell.   ¶94.   Indeed, this supposed disclosure that Defendants now cite has nothing to do with Uxin holding inventory of used cars at all.

Defendants assert that "Uxin never claimed that its 2C and 2B platforms were its sole business or that it did not also buy and sell used cars." Def. Br. at 19.  But Uxin *did* do exactly that.  On April 22, 2019, less than a week after the publication of the J Cap Report, Uxin issued a press releasing explicitly denying that it buys used cars, stating "Uxin has always served as a transaction platform which enables dealers to conduct used car business more efficiently in China, *and the Company does not take used car inventory*."  ¶147 (emphasis added).  *See also,* Exhibit J to the Declaration of Robert A. Fumerton ("Fumerton Decl."), filed in support of Defendants' Motion to Dismiss, at page 5/10.  Defendants cannot have it both ways; that Defendants story changes depending on what is convenient to say at a given time is a powerful indicator of falsity.

### c. Defendants May not Contest Credibility of the J Cap Report on a Motion to Dismiss

Defendants make much of the notion that J Capital is a short seller who stands to gain financially if the price of Uxin shares decreases, and that a short seller report cannot form the basis of a complaint.  Defendants are wrong.  As the Southern District of New York has stated, "[t]he majority of courts that have addressed the issue have held that a short-seller report . . . does not implicate the same skepticism as a traditional anonymous source." *McIntire v. China MediaExpress Holdings, Inc.,* 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013) (citing cases).  Courts do not discount a short seller report simply because the author stands to gain financially from driving down a company's stock price. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d

547, 564 (S.D.N.Y. 2012) ("The rationale is that a ruling that finds financial analysts' reports as suspect would mean that a plaintiff would never be able to rely on an unsigned analyst's report to support a securities fraud allegation.").

Indeed, short sellers do not blithely make unfounded allegations against a company. Disseminating false and misleading statements about a stock with the intent to profit from its fall is both a crime and a tort. In recent years, at least three short sellers have been sued for allegedly making false and misleading statements about U.S.-listed, China-based companies like Uxin, each for damages in excess of $10 million.[7] Barry Minkow has gone to prison and was ordered to pay restitution in excess of $500,000,000 for publishing false and misleading statements about a company while holding a short position in its stock.[8] If anything, J Capital has every incentive to make sure every factual statement it makes is true to avoid crippling litigation or indictment. And, incidentally, Defendants argument proves far too much: Uxin, like every issuer, has every incentive to mislead investors to create investor demand for its stock and complete its IPO. Uxin's public statements should therefore be similarly discounted.

That a short seller report may form the basis of a complaint notwithstanding, Plaintiffs do not simply "parrot" the J Cap Report. Plaintiffs' investigator independently corroborated J Cap's allegations by finding and interviewing former Uxin employees. *See e.g.* ¶¶73,74,95,102. Plaintiffs also independently obtained the Chinese language sources that J Capital relied on. ¶93.

---

[7] *E.g. Deer Consumer Products, Inc. v. Alfred Little*, Index No. 650823/2011 (N.Y. Sup. Ct. 2011); *Sino-Clean Energy, Inc. v. Alfred Little*, Index No. 651248/2011 (N.Y. Sup. Ct.); *Skypeople Fruit Juice Inc. v. Absaroka Capital Management LLC*, 11-CV-239-NDF (D. Wy.).
[8] *U.S. v. Minkow*, 11-cr-20209-PAS, (S.D. Fla.) (Dkt. #9, 33).

> **d. The Complaint Adequately Pleads that Uxin Failed to Disclose its Imminent Shift in Business Strategy**
>
> > **i. Temporal Proximity of the Shift in Business Strategy Strongly Supports Pre-IPO Knowledge**

Uxin's Registration Statement touted its proprietary Check Auto services, calling it a "critical foundation" of Uxin's business and "central to [Uxin's] platform." ¶60. Yet, less than two months later, Uxin announced a substantial shift in its business model that would eliminate Check Auto services for C2B transactions. It is reasonable to infer that that such a major change to a much-ballyhooed component of Uxin's business did not happen overnight, and that the short gap between the IPO and the announce of the change supports a strong inference that the change was already in the works at the time of the IPO.

Indeed, even when a plaintiff is required to plead scienter, the courts have held that "[t]emporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter." *Reese v. Malone,* 747 F.3d 557, 574 (9th Cir. 2014). *See also, Novak v. Kasaks,* 216 F.3d 300, 312-13 (2d Cir. 2000) ("the complaint provides specific facts concerning the Company's significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made).

That Uxin knew at the time of the IPO that it would cease providing Check Auto to C2B transactions and drastically curtail the C2B business is further buttressed by CW1, who stated that approximately one month before the IPO, employees started to hear that major changes were coming to the C2B business and a mass layoff of C2B staffers was imminent. ¶74.

Defendants argue that Plaintiffs engage in nothing more than "backwards pleading." Defendants' cases are inapposite. In *San Leandro Emergency Med. Grp. Profit Sharing Plan v.*

*Phillip Morris Cos.*, 75 F.3d 801, 807 (2d Cir. 1996), the Second Circuit held that the failure to disclose the possible adoption of an "alternative pricing plan" to cut prices that was test marketed for one month in Oregon was not actionable because "Companies conduct many experiments and tests in connection with their products, and to require the public announcement of each one would risk 'burying the shareholder in an avalanche of trivial information." Here, the change implicated a fundamental feature of Uxin's business, one that Uxin itself describes as a "critical foundation" of its business.

Defendants also cite *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) to argue that there is no liability where a "material fact was unknowable or had not even occurred as of the critical date."  But the issue there was whether Ikanos had experienced a trend in the return of defective semiconductor chips, and the complaint was "silent about the rate at which chips were being returned as of that date[.]" *Id.* The court added, "It is no secret that chips are subject to some percentage of failure…so the allegation that 'there were defects' is meaningless without more." *Id.*  Here, in contrast, the issue concerns a known trend concerning the abandonment of a critical service that Uxin repeatedly touted in the Registration Statement as a major reason for its success.[9]

### ii.   Item 303 Require Disclosure

---

[9] Defendants' other cases are also distinguishable, as they involve either a longer lag between the alleged failure to disclose a change in business and the event upon which the plaintiffs base their allegations, or else the possibility of a change was too speculative and remote.  *See e.g., In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) (alleged failure to disclose that Jumei was planning to exit the third-party beauty supply marketplace not actionable where the basis was that Jumei began implementing such a plan four months later); *In re Cosi, Inc. Sec. Litig.*, 379 F. Supp. 2d (S.D.N.Y. 2005) (alleged failure to disclose consideration of alternative franchising model not actionable where the sole basis was that Cosi had begun researching the possibility of franchising prior to the IPO, and plaintiffs concede that "the possibility of franchising…was still remote" at the time of the IPO).

Item 303 requires disclosure "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016).

Where a company is aware of an event or uncertainty, it is required to make disclosure under Item 303. In *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011), the Second Circuit held that an issuer is required to disclose in a registration statement "whether, and to what extent," any known trends or uncertainties in its business are "expected to materially impact [the issuer's] future revenue" – the exact information about Uxin's planned shift in business models that the Complaint alleges Uxin failed to disclose.

Uxin admits that the decision to eliminate Check Auto for C2B transactions is material, acknowledging after the IPO in Uxin's 2018 20-F, filed on April 29, 2019, that the change in business strategy "may have an adverse impact on our financial condition and results of operation." ¶71. Indeed, given the importance of Check Auto to Uxin's platform, it was no surprise that the decision to eliminate it for C2B transactions did have an adverse material impact on Uxin's 2B business. ¶¶66-71.

Defendants now argue that in the first quarter after the change, Uxin's *overall* business continued to grow. But this doesn't absolve Uxin. As the Second Circuit made clear in *Litwin*: "Blackstone is not permitted, in assessing materiality, to aggregate negative and positive effects on its performance fees in order to avoid disclosure of a particular material negative event." 634 F.3d at 719. Just because growth in other part of Uxin's business managed to offset the adverse impact to its C2B business does not mean that Uxin did not need to disclose the potential adverse impact to its C2B business.

18

Defendants also argue that Item 303 does not require disclosure of changes in business strategy, citing *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019). But this disregards that the Registration Statement repeatedly touts Uxin's Check Auto feature. In the Registration Statement, Uxin calls it a "key feature" and "critical foundation" of Uxin's business, and says that its "central to [Uxin]'s platform." ¶60. The Registration Statement describes Check Auto as the means by which Uxin provided "comprehensive and accurate descriptions of vehicles on our platform" and one of the five key stages of a user's "buying journey" on Uxin's platform. ¶61. Having made Check Auto a crucial component of its business, Uxin was obligated to disclose that it was discontinuing this very feature for a substantial portion of its market and the resultant impact on Uxin's prospects. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("when a corporation is pursuing a specific business goal and announces that goal as well as an intended approach for reaching it, it may come under an obligation to disclose other approaches to reaching the goal when those approaches are under active and serious consideration").

Further, in *Steamfitters,* the court noted that "Defendants signaled all along that they planned significant changes at Qualitest" and even disclosed that a planned acquisition of a non-generic drug manufacturer would be "transformational to…Endo's generic business model." 771 F. App'x at 496-97. In contrast, Uxin's Registration Statement barely mentions the C2B aspect of Uxin's 2B business, much less that significant changes were underway. Indeed, in *Litwin*, the Second Circuit held that Blackstone's failure to disclose the potential impact on the shift in a bond insurer's "strategy toward a less conservative approach to bond insurance" was actionable where the bond insurer was "not even mentioned in Blackstone's Registration

19

Statement and thus cannot be considered part of the 'total mix' of information already available to investors. 634. F3d at 718-19.[10]

## II. Defendants Fail to Satisfy Their Burden of Showing Negative Causation

Loss causation is not an element of a claim under either Section 11 or Section 12. *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 571 (S.D.N.Y. 2009). Defendants bear the burden of "negating" causation, an affirmation defense known as "negative causation." *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009). Defendants bear the heavy burden of demonstrating that something other than the alleged omissions or misstatements at issue caused Plaintiffs' loss. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009). Given the fact-intensive nature of such inquiries, the affirmative defense of negative causation is generally not properly raised on a motion to dismiss. *See Giant,* 643 F. Supp. 2d at 572 ("[T]he affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion.").

To support a finding of negative causation at the pleading stage, a plaintiff must "plead [himself] out of court" by alleging facts that establish an affirmative defense. *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009). Plaintiffs did no such thing here.

Even if the Court were to consider Defendants' arguments at the pleading stage, they fall woefully short of establishing negative causation. Defendants argue that there was no stock drop following Uxin's announcement of the change to its 2B business on August 22, 2018. But Defendants ignore that in the same announcement, Uxin trivialized the change, telling investors

---

[10] Similarly in *In re Canandaigua Sec. Litig.*, 944 F. Supp. 1202 (S.D.N.Y. 1996) the change in pricing strategy was a typical "marketing strategy for a consumer-based marketing company" and the court noted that "Canandaigua made no statement that indicates either a utilization or disavowal of any potential price discounting scheme and did not hype a specific plan." *Id.* at 1208. Uxin's Registration Statement, on the other hand, repeatedly hyped Check Auto.

that GMV from Uxin's C2B business "has historically made an immaterial contribution to our overall business." ¶65. Defendants' misrepresentation distorted investors' evaluation of the information and prevented the market from accurately reacting to the announcement. *In re Gilead Sciences Sec. Litig.,* 536 F.3d 1049, 1057-58 (9th Cir. 2008) (rejecting "bright-line rule requiring an immediately market reaction" because "the market is subject to distortions that prevent the ideal of a free and open public market from occurring"). It was not until Uxin announced its Q3 2018 financial results on November 19, 2018 that the market began to learn that this change might have a material impact on Uxin's profitability. And Uxin shares fell nearly 12% in response.

Defendants contend, without any evidence, that Uxin's stock drops following the announcement of the Q3 and Q4 2018 earnings results were not related to the decline in the 2B business as a result of Uxin's changing business model. Defendants fault Plaintiffs for "mak[ing] no attempt to disentangle the portions of these drops attributable to the 2B business as opposed to other operating results." Def. Br. at 21. But that's not Plaintiffs' burden. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) ("The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations."). Instead, Defendants have the burden of demonstrating that all of the stock price decline was unrelated to misstatements or omissions in the Registration Statement, which Defendants have failed to do. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 587 (S.D.N.Y. 2015) ("where the burden of proving negative loss causation falls on defendants, the exact same inability to disentangle works to defendants' disadvantage.").

21

For Plaintiffs' Section 10(b) claim, Plaintiffs have the burden of pleading loss causation. To plead loss causation, a complaint need only provide the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *Loreley*, 797 F.3d at 189. Defendants argue that the J Cap Report cannot serve as a "corrective disclosure" for Section 10(b) loss causation purposes because it merely offers J Capital's opinion on already-public information. Defendants are wrong. First, the J Cap Report was not based solely on analysis of publicly-available information. Rather, J Capital performed an extensive investigation in China, and relied on numerous interviews with former Uxin employees and dealers. ¶80. Second, to the extent that the J Cap Report relies on Chinese-language sources, courts in this circuit have overwhelmingly held that Chinese-language sources are not publicly available to investors of securities listed in the U.S. *Fuwei Films,* 634 F. Supp. 2d at 438 ("The Court finds that the publication of three newspaper articles—in Chinese—does not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to Fuwei's stockholders."); *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, 2012 WL 12893520, at *7 (C.D. Cal. Feb. 16, 2012) (reasonably diligent U.S. investors cannot be charged with discovering Chinese-language regulatory filings). None of the cases that Defendants cite involve Chinese-language sources. Nor did the authors of the alleged corrective disclosures in those cases perform any independent, on-the-ground investigation, much less the sort of extensive field investigation that that J Capital did to uncover evidence, including interviewing former employees and dealers.

At bottom, Defendants' argument fails to consider the actual content of the J Cap Report, and instead asks the Court to infer that the information was "public" because of the boilerplate disclaimer in the J Cap Report that the information was "obtained from public sources." J

22

Capital's disclaimer, in context, is clearly an attempt to avoid any suggestion that it accessed material non-public information giving rise to potential liability under insider trading laws.  In any event, J Capital's boilerplate disclaimer cannot override the actual content of its Report.

### III. Plaintiffs Have Standing under Section 12(a)(2)

A plaintiff has standing to sue under Section 12(a)(2) if he purchased his shares in the IPO, even if he doesn't identify the specific underwriter from whom he purchased his shares.  *In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 832 (S.D.N.Y. 2017).  Defendants do not dispute this, but rather contend that none of the Plaintiffs alleged that they purchased Uxin shares in the IPO.  Defendants are mistaken.  Lead Plaintiff Gahtan purchased 150 Uxin shares on the date of the IPO (June 27, 2018) at the IPO price ($9.00).  *See* Dkt. No. 7-2.

Defendants take issue with the Complaint's wording, which Defendants misinterpret to mean that Gahtan purchased in the aftermarket. However, the Complaint states that Gahtan purchased his Uxin shares pursuant to the Registration Statement "during the Class Period." ¶30.  The IPO is part of the Class Period. ¶1.  Thus Gahtan has standing under Section 12(a)(2).

### IV. The Complaint Adequately Pleads Scienter

While even innocent misstatements are actionable under Sections 11 and 12, a claim under Section 10(b) requires that Plaintiffs plead scienter.  Plaintiffs may plead a strong inference of scienter by showing (1) motive and opportunity to commit fraud, *or* (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

In determining whether "the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). A court "must consider plausible, nonculpable

23

explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. The inference that defendant acted with scienter, however, need "not be irrefutable" or "even the most plausible of competing inferences." *Id.* It need only be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* In other words, a tie goes to Plaintiffs.

The Complaint pleads several indicia of scienter:

**First,** less than a week after the publication of the J Cap Report, Uxin issued a press release on Form 6-K, signed by Defendant Zeng, expressly denying J Capital's allegations that Uxin inflated transaction volume and GMV, that Uxin itself purchases used cars to sell. Fumerton Decl., Ex. J. If the Court finds that the Complaint adequately alleges that Uxin purchased used cars to sell or that Uxin inflated transaction volume and GMV, then Uxin's denial is a false exculpatory statement to cover up its fraud, demonstrating scienter. *Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 264 (5th Cir. 2005) ("that the defendants persisted in the incorrect accounting after it was brought to their attention supports a strong inference of scienter"); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1338 (S.D. Fla. 1999) (defendants' denial of reports alleging fraud – including assertion that reports were "propaganda stirred up by 'shorts'" – indicated that defendants "were either sufficiently familiar with the facts, or severely reckless in not being familiar, to be in a position to issue a denial."); *see also U.S. v. Quiroz*, 13 F.3d 505, 510 (2d Cir. 1993) (a defendant's false exculpatory statement is admissible at trial to show his consciousness of guilt).

**Second**, Defendants Dai and Zeng were Uxin's CEO and CFO, respectively, and each signed the Registration Statement containing the misleading statements and omissions. Thus, Dai and Zeng either had knowledge of the fraud, or they were reckless in issuing false statements. *In*

*re Alstom SA*, 406 F. Supp. 2d 433, 459–60 (S.D.N.Y. 2005) (scienter adequately pled as to the CEO and CFO of Alstom because, "in order to sign the SEC filing documents, [the CEO and CFO] had a 'duty to familiarize themselves with the [operations of Alstom]'").

**Third**, according to CW1, the reason Uxin curtailed its C2B business was because Uxin was buying used cars at higher prices than what Uxin was ultimately able to sell them to dealers. ¶148. This shows that Uxin's management – at minimum CEO Dai and CFO Zeng – knew that Uxin purchased used cars to sell. The scienter of individual corporate officers can be imputed to the corporation. *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995).

### V. The Complaint Adequately Pleads Control Person Liability

Contrary to Defendants' assertion, Plaintiffs are not precluded from pleading that the same Individual Defendants are both primary violators and control persons. *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388 (S.D.N.Y. 2005). Additionally, Section 15 does not require that Plaintiffs plead defendants "culpably participated" in the alleged misconduct. *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012) (collecting cases). It is "well settled that officers and directors of the primary violator who signed the registration statements containing [the false statements] fulfill the control prong." *Plumbers' & Pipefitters' Local No. 562 Supplemental Plan & Tr. v. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *20 (E.D.N.Y. Feb. 23, 2012).

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any part of the Motion, Plaintiffs respectfully request leave to amend. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) (holding that courts should be especially liberal in granting leaves to amend in cases of dismissed securities fraud claims).

25

Dated:  March 9, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Phillip Kim*
Phillip Kim
Laurence Rosen
Yu Shi
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
　　　 lrosen@rosenlegal.com
　　　 yshi@rosenlegal.com

*Counsel for Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Plaintiffs*