UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PATRICK MACHNIEWICZ, individually and
on behalf of all others similarly situated,

               Plaintiff.,

      vs.

UXIN LIMITED, KUN DAI, ZHEN ZENG,
RONG LU, JULIAN CHENG, DOU SHEN,
HAINAN TAN, MORGAN STANLEY & CO.
INTERNATIONAL PLC, GOLDMAN SACHS
(ASIA) L.L.C., J.P. MORGAN SECURITIES
LLC, CHINA INTERNATIONAL CAPITAL
CORPORATION HONG KONG SECURITIES
LIMITED, and CHINA RENAISSANCE
SECURITIES (HONG KONG), LIMITED,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19-cv-822 (MKB) (VMS)

**Oral Argument Requested**

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ..............................................................................................1

I.      PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION OR OMISSION .......3

        A.      Omission of a Future Change to Uxin's 2B Business Was Not Misleading ...........3

        B.      Uxin's GMV and Transaction Volume Were Not False or Misleading .................5

        C.      Plaintiffs Do Not Adequately Allege Uxin Bought and Sold Used Cars ...............7

II.     PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION.....................................................8

III.    PLAINTIFFS FAIL TO ALLEGE SCIENTER ..................................................................9

CONCLUSION........................................................................................................................10

# TABLE OF AUTHORITIES

## CASES

*In re Alstom SA*,
      406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................10

*Axar Master Fund, Ltd. v. Bedford*,
      No. 19-1132-CV, 2020 WL 1456482 (2d Cir. Mar. 23, 2020).........................................10

*In re Barclays Bank PLC Securities Litigation*,
      756 F. App'x 41 (2d Cir. 2018) ...................................................................................8

*Cal. Public Employees' Retirement System v. Chubb Corp.*,
      394 F.3d 126 (3d Cir. 2004).........................................................................................4

*In re China Mobile Games & Entertainment Group, Ltd. Securities Litigation*,
      No. 14 Civ. 4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016)............................8

*Cornwell v. Credit Suisse Group*,
      689 F. Supp. 2d 629 (S.D.N.Y. 2010).............................................................................7

*Cox v. Blackberry Ltd.*,
      660 F. App'x 23 (2d Cir. 2016) ...................................................................................10

*In re Frontier Communications, Corp. Stockholders Litigation*,
      No. 3:17-CV-1617 (VAB), 2019 WL 1099075 (D. Conn. Mar. 8, 2019) .........................8

*In re Gilead Sciences Securities Litigation*,
      536 F.3d 1049 (9th Cir. 2008) ......................................................................................9

*Holbrook v. Trivago N.V.*,
      17 Civ. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd*, 796 F.
      App'x 31 (2d Cir. 2019)..............................................................................................7

*In re Jumei International Holding Ltd. Securities Litigation*,
      No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017)................................................4

*Lentell v. Merrill Lynch & Co.*,
      396 F.3d 161 (2d Cir. 2005)...........................................................................................8

*Litwin v. Blackstone Group, L.P.*,
      634 F.3d 706 (2d Cir. 2011)...........................................................................................4

*Meyer v. Jinkosolar Holdings Co.*,
      761 F.3d 245 (2d Cir. 2014)...........................................................................................7

ii

*In re MRU Holdings Securities Litigation*,
769 F. Supp. 2d 500 (S.D.N.Y. 2011)................................................................8

*Ramzan v. GDS Holdings Ltd.*,
No. 19-CV-9154 (LAK), 2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020)............................10

*Resnik v. Swartz*,
303 F.3d 147 (2d Cir. 2002).....................................................................6

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, Inc.*,
75 F.3d 801 (2d Cir. 1996)......................................................................4, 5

*Steamfitters' Industry Pension Fund v. Endo International PLC*,
771 F. App'x 494 (2d Cir. 2019) ................................................................3

*In re Uxin Ltd. Securities Litigation*,
No. 650427/2019, 2020 N.Y. Slip Op. 50336(U)
(Sup. Ct. NY. Cty. Mar. 9, 2020)..............................................................1, 3, 5

*Zhong Zheng v. Pingtan Marine Enterprise Ltd.*,
379 F. Supp. 3d 164 (E.D.N.Y. 2019) ..........................................................9

**PRELIMINARY STATEMENT**

Plaintiffs' Opposition confirms that they cannot plead a securities fraud claim predicated on (i) Uxin's post-IPO shift in business strategy; (ii) Uxin's post-IPO change in the way it calculates transaction volume and GMV; or (iii) baseless speculation from anonymous sources about Uxin's business model. Plaintiffs simply fail to identify any misrepresentation or actionable omission in Uxin's Registration Statement. Regarding the C2B strategy shift, as Justice Borrok recently held in dismissing identical claims in the parallel state court action:

> [P]laintiffs' allegations fail to state a claim because the post-IPO change simply did not retroactively render anything in the Offering Documents false or misleading and because the Complaint does not allege that the anything concerning the inspections and/or the B2 [sic] Business was known or should have been known to be false at the time of the IPO, and to the extent that the plaintiffs claim that the offering documents did not disclose that dropping these services would result in a corresponding decrease in transactions on its 2B platform or disclose the magnitude that such a change would have on the company's business, this claim is directly contradicted by the offering documents, which as described above, indicated that "[i]f we fail to maintain a high level of customer satisfaction or fail to properly manage our warranty and car inspection programs or other services, our business, financial condition and results of the operation would be adversely affected."

*In re Uxin Ltd. Sec. Litig.*, No. 650427/2019, 2020 N.Y. Slip Op. 50336(U), at *7-8 (Sup. Ct. NY. Cty. Mar. 9, 2020) (citation omitted). Plaintiffs' Opposition does not even mention the state court's decision (issued the same day) and cannot overcome any of these fatal defects, which likewise doom their claims as a matter of law.

Like the C2B claims, Plaintiffs' claims regarding the Company's calculation of transaction volume and GMV are also based solely on hindsight. The transaction volume and GMV reported in the Registration Statement were not retroactively rendered misleading because the Company later changed how it would calculate those metrics going forward to include only revenue-generating transactions. The Opposition's only response is to argue that including non-revenue-generating transactions in the transaction volume and GMV reported in the Registration

Statement misled investors about Uxin's revenue and growth trajectory. But, investors did not have to use transaction volume and GMV as a proxy for revenue because the Registration Statement separately disclosed Uxin's revenue, which Plaintiffs do not claim was inaccurate.

Finally, the Opposition cannot rectify the complete lack of well-pled factual support for Plaintiffs' conclusory accusation that Uxin buys and sells used cars, which it supposedly failed to disclose. Plaintiffs point to three "sources," all of which rely on allegations from anonymous purported former employees, but none of these are described with any particularity.

In addition to the failure to identify any false statement or omission, all of Plaintiffs' claims also fail due to lack of loss causation. For example, Plaintiffs cannot deny that Uxin's stock price *increased* on the day the C2B change was announced. Instead, the Opposition tries to confuse the issue by arguing that the market reacted negatively to the subsequent impact of the change (i.e., decreased 2B transaction volume and revenue in the next quarter). But Plaintiffs' claims are based on the allegation that the Company failed to disclose the C2B change itself, and investors simply suffered no loss when that change was disclosed. The *future impact* of the change is not what Plaintiffs claim should have been disclosed—and in any event could not have been disclosed in the Registration Statement, which was issued before the change took place.

Additionally, Plaintiffs' Exchange Act claims also fail for lack of scienter. The Complaint is devoid of any factual allegations even suggesting Uxin drafted the Registration Statement with an intent to defraud investors. The three supposed "indicia of scienter" the Opposition cites—Uxin's denial of the J Capital Report, Defendants Dai and Zeng's positions as CEO and CFO, and a single purported Uxin appraiser's speculation about the rationale for certain company-wide strategic decisions—have no merit, as the Opening Brief demonstrated.

In sum, the Opposition leaves no doubt that the Complaint should be dismissed.

2

## ARGUMENT[1]

**I.      PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION OR OMISSION**

### A.      Omission of a Future Change to Uxin's 2B Business Was Not Misleading

Plaintiffs do not allege that the Registration Statement misrepresented any aspect of Uxin's C2B business as it existed *at the time of the IPO*. Instead, the Opposition primarily argues that Item 303 required disclosure that Uxin would shift its C2B business strategy *after the IPO*. As the Opening Brief showed, Item 303 does not apply for at least three separate reasons.

First, as the state court recognized in rejecting the exact same argument, "a business strategy decision, such as the one made by Uxin concerning the change to its 2B Business, 'is not the type of disclosure Item 303 requires.'" *Uxin*, 2020 N.Y. Slip Op. 50336(U), at *8 (quoting *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 498 (2d Cir. 2019)). Plaintiffs argue that Item 303 nevertheless applies here because "the Registration Statement repeatedly touts Uxin's Check Auto feature," whereas the company in *Steamfitters'* "signaled" its future strategy shift. (Opp. at 19.) But this is a distinction without a difference. As *Steamfitters'* confirmed, 771 F. App'x at 496-98, Item 303 simply does not apply to business strategy decisions, and the other statements in the Registration Statement—which were admittedly accurate when issued—did not somehow render the Company's truthful C2B disclosures misleading.[2]

---

[1]    Plaintiffs do not dispute that Securities Act claims sounding in fraud are subject to Rule 9(b), and they concede that their Securities Act allegations "could be explained by fraud." (Opp. at 9.) Nevertheless, Plaintiffs insist they should be able to plead in the alternative because their Securities Act claims are also "consistent with negligence." (Opp. at 9-10.) But, unlike in the cases they cite, Plaintiffs do not allege any facts suggesting negligent conduct. Instead, the Complaint relies upon the same allegations for both its Exchange Act and Securities Act claims. Indeed, Plaintiffs parrot many of these allegations from J Capital, who expressly characterizes them as "allegations of fraud." (*See* Ex. K at 1, concurrently submitted with the Declaration of Robert A. Fumerton, dated April 24, 2020.) Regardless, Plaintiffs fail to state a claim even under the more liberal pleading standards of Rule 8, much less the more exacting standards of Rule 9(b) and the PSI.RA.

[2]    The one case Plaintiffs cite is not to the contrary and is factually inapposite, as it concerns disclosures about the

Second, the Opposition effectively concedes that Plaintiffs have not alleged that Uxin knew at the time of the IPO that it would change its C2B business two months later. Plaintiffs instead urge the Court to "infer" that such a decision could not have been made "overnight." (Opp. at 16.) "Courts have previously rejected similar efforts to 'ask the Court to assume that Defendants <u>must</u> have known because something did in fact occur later' as 'simply inadequate pleading.'" *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14cv9826, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (citation omitted) (rejecting argument that it was "inconceivable" that defendant's change in strategy was "hatched overnight"). Plaintiffs try to distinguish this line of cases based on the length of time between the Registration Statement and the C2B change, but courts have dismissed similar claims, even where the gap between the alleged omission and the alleged corrective disclosure was short. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 805-07, 810 (2d Cir. 1996) (disclosures not rendered misleading by new plan one month later).[3]

Third, even if Uxin had decided to change the C2B business by the time of the IPO, Plaintiffs do not allege the Company expected that change to materially impact its business. The Opposition points to Uxin's 2018 Form 20-F—filed 10 months after the IPO—which stated that the change in C2B strategy "***may*** not achieve expected results and ***may*** have a material and adverse impact." (AC ¶ 71.) But warning of the mere possibility that the change may have a

---

defendant's exposures to subprime mortgage derivatives at the time the disclosure was made, not a future business strategy decision like Plaintiffs' claims here. *See Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 710-11, 718-19 (2d Cir. 2011) (cited in Opp. at 18-19) (Item 303 required Blackstone to disclose its investment in a failing monoline insurer with billions of dollars in exposure to subprime mortgage derivatives).

[3] CW1 is of no help to Plaintiffs as he does not even claim that Uxin had decided to change its C2B business by the time of the IPO, only that he heard rumors of some unspecified potential change and possible layoffs. (Opp. at 16 (citing AC ¶ 74).) "Generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient[.]" *Cal. Pub. Emps' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004).

4

material impact does not indicate it actually did, much less that the Company expected such an impact nearly a year earlier. *See Uxin*, 2020 N.Y. Slip Op. 50336(U), at \*9 ("[R]egardless of the actual impact the change may have had, plaintiffs do not allege any facts showing that the defendants knew . . . that the change would have a material effect on the business[.]").[4]

Separately, omission of the future C2B change also did not render the Registration Statement's other disclosures misleading. The Second Circuit has squarely held that statements "simply reflect[ing] company policy at the time" and "not promis[ing] to maintain that policy in the future" are "not rendered misleading by the company's subsequent consideration of an alternative plan." *Philip Morris*, 75 F.3d at 811; *accord Uxin*, 2020 N.Y. Slip Op. 50336(U), at \*8 ("[T]he post-IPO change simply did not retroactively render anything in the Offering Documents false or misleading . . . ."). Plaintiffs try to distinguish *Philip Morris* as involving "trivial information," whereas the change here was supposedly "fundamental." (Opp. at 17.) But Philip Morris' change in pricing strategy "was important enough that it required board of directors approval" and was "expected to reduce the company's 1993 profits by $2 billion." *Philip Morris*, 75 F.3d at 809.[5]

### B.    Uxin's GMV and Transaction Volume Were Not False or Misleading

Contrary to Plaintiffs' assertions, the fact that the GMV and transaction volume reported in the Registration Statement included non-revenue-generating transactions does not render the reported numbers false or misleading. Although the state plaintiffs' claims regarding GMV and

---

[4]    Moreover, as the state court aptly noted, "to the extent that the change in services and business strategy was a potential risk factor at the time of the IPO, . . . the Prospectus disclosed that this was a material risk." *Uxin*, 2020 N.Y. Slip Op. 50336(U), at \*8; (*see* Ex. A at 16).

[5]    *Philip Morris* also clarified that *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993), on which Plaintiffs rely (Opp. at 16, 19), "went nearly to the outer limit" of imposing a duty to disclose, which arises only where "the company . . . 'hyped' a specific plan, thereby inducing investors to believe that alternatives were excluded." *Philip Morris*, 75 F.3d at 810-11. Here, Plaintiffs concede the "Registration Statement barely mentions the C2B aspect of Uxin's 2B business . . . ." (Opp. at 19.)

transaction volume were sustained, the state court—like Plaintiffs' Opposition here—ignored that the Registration Statement did not represent that those metrics included only revenue-generating transactions and separately (and accurately) reported Uxin's revenue.[6]

Instead, Plaintiffs argue Uxin's claim that it is the largest used car e-commerce platform in China, as measured by transaction volume and GMV, was misleading. (Opp. at 11.) But Plaintiffs do not allege that any competitor had a higher transaction volume and GMV than Uxin, even if non-revenue-generating transactions were excluded. Moreover, the claim about Uxin's relative transaction volume and GMV came from a particular industry report prepared by a company called iResearch. (*See* Ex. A at 1.) Plaintiffs allege nothing about iResearch, including its methodology, which would be necessary to assess its accuracy.[7]

There is likewise no merit to Plaintiffs' argument that the Registration Statement was misleading because "an increase in transaction volume would not necessarily lead to revenue growth." (Opp. at 12.) Investors did not have to use transaction volume as a proxy for revenue growth because the Registration Statement separately disclosed Uxin's revenue—which Plaintiffs do not contend was inaccurate. (*See* Br. at 17-18.) The Opposition does not even address this argument. Further, to the extent Plaintiffs argue transaction volume figures painted an overly optimistic picture of revenue growth (Opp. at 11-12), they have it backwards. The inclusion of non-revenue-generating transactions means that dividing Uxin's revenue by its

---

[6]    The state court also did not address scienter, which was not an element of the state plaintiffs' claims. The absence of scienter here independently warrants dismissal of Plaintiffs' Exchange Act claims regardless of whether there was an actionable misstatement or omission. (*See infra* at 9-10.) Defendants have also appealed the state court's decision insofar as it sustained the claims relating to transaction volume and GMV.

[7]    Plaintiffs suggest that Uxin's inclusion of non-revenue-generating transactions was nevertheless "material information that any reasonable investors would find important in evaluating an investment in Uxin." (Opp. at 11.) But "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002).

reported transaction volume would have ***underestimated*** revenue per transaction.[8]

### C.        Plaintiffs Do Not Adequately Allege Uxin Bought and Sold Used Cars

Lastly, none of the three sources the Opposition cites plausibly allege that Uxin buys and sells used cars.  (*See* Opp. at 12-14.)  As to the alleged online post, it is from March 2017—more than a year before the IPO in June 2018—and should be disregarded on that basis alone.  Moreover, the post is based solely on purported former employees, but provides no information about the basis of their supposed knowledge.  Without such information, Plaintiffs cannot rely on the post, as the Opposition implicitly concedes.  (*See* Opp. at 13 (acknowledging confidential witnesses must be "described with sufficient particularity to 'support the probability that a person in the position occupied by the source would possess the information alleged'").)[9]

Like the online post, the J Capital report fails to provide any detail whatsoever about its purported confidential witnesses.  (Ex. I at 16.)  The report also claims J Capital personnel "visited a Uxin lot in the city of Shijiazhuang and found about 15 cars that [they] believe had been purchased by Uxin because they had been issued temporary plates."  (*Id.*)  But the report provides no plausible reason why this would suggest Uxin had purchased those cars.  To the contrary, as the Company explained, the Shijiazhuang lot "is an offline fulfillment center" and the cars there have only temporary license plates precisely because "Uxin does not buy or own the cars," which are merely "waiting to be picked up by car buyers or to be delivered out of the city."  (Ex. J at 5.)  Plaintiffs' allegations do not plausibly suggest otherwise.

---

[8]     Plaintiffs also cite the generic proposition that "once a company speaks on an issue or topic, there is a duty to tell the whole truth."  (Opp. at 12.)  But "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject."  *Holbrook v. Trivago N.V.*, 17 Civ. 8348 (NRB), 2019 WL 948809, at *14 (S.D.N.Y. Feb. 26, 2019) (citation omitted), *aff'd*, 796 F. App'x 31 (2d Cir. 2019).  *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014) (cited in Opp. at 12), is inapposite.  There, the company's descriptions of its extensive regulatory compliance efforts were deemed misleading for omitting that those efforts "were then failing to prevent substantial violations," which the company later admitted.  *Id.* at 251.

[9]     Plaintiffs' cited case only highlights the inadequacy of their own allegations.  *See Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (relying on "an array" of confidential witnesses whose jobs were described in detail and who allegedly directly reported the alleged risks to the CEO and CFO).

Finally, Plaintiffs' confidential witness ("CW1") is similarly insufficient. (AC ¶¶ 73, 95.) *See In re Frontier Commc'ns, Corp. Stockholders Litig.*, No. 3:17-CV-1617 (VAB), 2019 WL 1099075, at *23 (D. Conn. Mar. 8, 2019) ("[T]he Court cannot determine if Plaintiffs' single confidential informant, who oversaw one state's operations, . . . could provide the alleged information because [among other things] the former employee's access to company-wide data is not described with sufficient particularity . . . ."). Indeed, that Plaintiffs found only one purported CW to attest to a supposedly core aspect of Uxin's business undermines the plausibility of such allegations. *See In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, No. 14 Civ. 4471 (KMW), 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (disregarding allegations of lone CW, which "could describe the anomalies of a rogue fiefdom rather than company-wide practices" (citation omitted)); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." (citation omitted)).

## II.      PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

All of Plaintiffs' claims also fail because the Complaint itself confirms that there is no causal connection between the purported misrepresentations and any loss. Indeed, the Company's stock price ***increased*** on the day it announced the shift in 2B strategy. (Br. at 20-22.) The Opposition entirely misses the point by arguing that the stock price ***later*** fell when Uxin announced that its 2B transaction volume and revenue were down in Q3 2018, the first quarter that excluded C2B sales. (Opp. at 21.) The ultimate impact of the change is irrelevant. *See In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 45 (2d Cir. 2018) ("[D]efendant must establish that . . . 'the subject of the misstatements and omissions was not the cause of the actual loss suffered.'" (citation omitted)); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (to be actionable, omission must have "concealed something from the market that, ***when***

8

*disclosed*, negatively affected the value of the security" (emphasis added)).  For the same reason, Plaintiffs' argument that Uxin supposedly "trivialized the change" when it was announced is also irrelevant.  (Opp. at 20.)  The Company simply noted that the C2B business "historically made an immaterial contribution to [Uxin's] business," which Plaintiffs do not dispute.  (AC ¶ 65.)[10]

The Opposition's arguments regarding the J Capital report likewise fail.  Plaintiffs argue J Capital relied on Chinese-language sources, which cannot be considered publicly available (Opp. at 22), but this "ignores the realities of the accessibility of the internet," especially for Plaintiffs who chose to invest in a Chinese company, as other courts have held.  *See, e.g.*, *Zhong Zheng v. Pingtan Marine Enter. Ltd.*, 379 F. Supp. 3d 164, 178 (E.D.N.Y. 2019) (rejecting "contention that the sources of the [short seller report] are 'obscure' foreign sources, and therefore, not publicly available information").  Plaintiffs also urge the Court to disregard J Capital's express disclaimer that its report is based only on "public sources" (Opp. at 22-23)— once again highlighting Plaintiffs' selective reliance on the J Capital Report when they view it as helpful while conveniently ignoring those parts that undermine their claims.

## III.     PLAINTIFFS FAIL TO ALLEGE SCIENTER

Plaintiffs' Exchange Act claims independently fail because Plaintiffs do not allege scienter.  (Br. at 22-24.)  The Opposition does not dispute that Plaintiffs do not allege motive and opportunity to commit fraud and Plaintiffs' half-hearted attempt to identify circumstantial "indicia of scienter" does not withstand even cursory scrutiny.  (*See* Opp. at 23-25.)

First, although Uxin denies buying used cars, Plaintiffs have not alleged facts showing

---

[10]    The lone case Plaintiffs cite on this point is not to the contrary as the initial corrective disclosure there only partially revealed the omitted information, and thus did not cause a stock price decline (which later followed the full revelation).  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (cited in Opp. at 21).  By contrast, here, the allegedly omitted information—the decision to shift the C2B strategy—was fully disclosed upon the announcement of that decision, which was accompanied by a stock price increase.

that denial is false.  (*See supra* at 7-8.)   If a simple denial suffices to show fraudulent intent, innocent targets of a short seller report could be held liable on this basis alone.  As to transaction volume, Uxin ***acknowledged*** that it "facilitated a certain number of used car transactions free of service charge" and reiterated that "GMV is not the Company's revenue."  (Ex. J at 4, 6.)[11]

Second, courts have repeatedly rejected attempts, like Plaintiffs', to establish scienter based on executives' high-ranking positions.  (*See* Br. at 23); *see also Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) ("The fact that defendants Heins and Bidulka occupied high-ranking positions at BlackBerry . . . is insufficient to establish scienter."); *Ramzan v. GDS Holdings Ltd.*, No. 19-CV-9154 (LAK), 2020 WL 1689772, at *4 (S.D.N.Y. Apr. 7, 2020) ("It is well established that '[s]cienter cannot be inferred solely from . . . defendants' board membership or executive managerial position." (first alteration in original) (citation omitted)).[12]

Finally, CW1 does not even claim that Uxin's CEO and CFO knew that Uxin supposedly bought and sold used cars, let alone claim that they concealed such information in order to defraud investors.  (Opp. at 25.)  CW1 provides no basis for his conjecture about why Uxin decided to "curtail its C2B business" and does not claim to have had any contact with the Company's executives.  (*See* AC ¶ 148.)  One low-level employee's speculation is not a reasonable basis to infer anything about senior management's knowledge or motivations.

## CONCLUSION

For these reasons and those in the Opening Brief, the Complaint should be dismissed.[13]

---

[11]   As J Capital put it, Uxin "all but admits . . . that it includes unrelated transactions in GMV."  (Ex. K at 2.)

[12]   By contrast, in *In re Alstom SA*, 406 F. Supp. 2d 433 (S.D.N.Y. 2005) (cited in Opp. at 25), there were multiple bases to infer scienter in addition to the executives' positions, including "the magnitude of the . . . customer financing arrangements[] and the significant length of time (several years)" they were concealed.  *Id.* at 460.

[13]   Plaintiffs' request for leave to amend should be denied.  *See Axar Master Fund, Ltd. v. Bedford*, No. 19-1132-CV, 2020 WL 1456482, at *3 (2d Cir. Mar. 23, 2020) (affirming denial of leave to amend securities claims).

Dated: New York, New York
       April 24, 2020

   /s/ Robert A. Fumerton
   Scott D. Musoff
   (scott.musoff@skadden.com)
   Robert A. Fumerton
   (robert.fumerton@skadden.com)
   Michael C. Griffin
   (michael.griffin@skadden.com)
   **SKADDEN, ARPS, SLATE,**
     **MEAGHER & FLOM LLP**
   One Manhattan West
   New York, NY 10001
   Telephone:  (212) 735-3000
   Facsimile:  (212) 735-2000

*Attorneys for Defendant Uxin Limited*

   /s/ Jonathan Youngwood
   Jonathan Youngwood
   (jyoungwood@stblaw.com)
   Janet A. Gochman
   (jgochman@stblaw.com)
   **SIMPSON THACHER &**
     **BARTLETT LLP**
   425 Lexington Avenue
   New York, NY 10017
   Tel: (212) 455-2000
   Fax: (212) 455-2502

*Attorneys for Morgan Stanley & Co.*
*International plc, Goldman Sachs (Asia)*
*L.L.C., J.P. Morgan Securities LLC and*
*China Renaissance Securities (Hong Kong)*
*Limited*